## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARIEL MOORE**,

    Plaintiff,

        v

**CITY OF DETROIT**, a municipal
corporation, **GARY STEELE**, and
**MICHAEL GARRISON**

    Defendants.

Case No.

Judge

Magistrate

---

*FIEGER, FIEGER, KENNEY*
*& HARRINGTON, P.C.*
By: Geoffrey N. Fieger (P30441)
    Gregory W. Wix (P65424)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
Phone: (248) 355-5555
Fax: (248) 355-5148
Email: g.wix@fiegerlaw.com

---

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

**NOW COMES** Plaintiff, ARIEL MOORE, by and through her attorneys,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., and for her cause of action

against the above-named Defendants, states as follows:

1.      That, at all times relevant, Plaintiff, ARIEL MOORE ("**MS. MOORE**"), was a resident of the City of Detroit, County of Wayne and State of Michigan.

2.      That, at all times relevant hereto, and upon information and belief, Defendant, GARY STEELE ("**STEELE**"), was a resident of the City of Detroit, County of Wayne and State of Michigan.

3.      That, at all times relevant hereto, and upon information and belief, Defendant, MICHAEL GARRISON ("**GARRISON**"), was a resident of the City of Detroit, County of Wayne and State of Michigan.

4.      That, at all times relevant to this lawsuit, Defendant, CITY OF DETROIT ("**CITY**"), is a municipal corporation located in the County of Wayne and State of Michigan and, among other services, it provides to its residents a police agency, namely the City of Detroit Police Department, which acts under the color of Michigan state law.

5.      That, at all times relevant, and upon information and belief, the City of Detroit was the employer of Defendants, STEELE and GARRISON.

6.      That the violations committed by Defendants, STEELE and GARRISON, were all committed while acting within the course and scope of their employment with the City of Detroit.

7.    That Defendant, CITY is properly sued directly under 42 U.S.C. § 1983 for their own and their delegated deliberately indifferent unconstitutional decisions, policies, practice, habits, customs, usages, training and derelict supervision, ratification, acquiescence and intentional failures, which were moving forces in the complained of constitutional and statutory violations.

8.    That Defendants are not immune from suit by governmental immunity for claims of gross negligence and/or intentional infliction of emotional distress.

9.    That the acts, transactions, occurrences and/or omissions occurred within the City of Detroit, County of Wayne and State of Michigan.

10.    That the amount in controversy herein exceeds the sum of seventy-five thousand and 00/100 ($75,000.00) dollars, exclusive of costs, interest and attorney fees.

## JURISDICTION AND VENUE

11.    That Plaintiff hereby reincorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

12.    That this is a civil action for money damages brought pursuant to 42 U.S.C. § 1983 and costs and attorney fees under 42 U.S.C. §1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

13.    That this Court has original jurisdiction over Plaintiff's claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331, 1343 (a)(3), 1343(a)(4) and 42 U.S.C § 1983.

14.    That the amount in controversy herein exceeds the sum of seventy-five thousand and 00/100 ($75,000.00) dollars, exclusive of costs, interest and attorney fees.

15.    That the unlawful actions alleged in this Complaint took place within the jurisdiction of the United States District Court for the Eastern District of Michigan (Southern Division).  Venue is proper under 28 U.S.C. § 1391(b).

### *FACTUAL ALLEGATIONS*

16.    That Plaintiff hereby reincorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

17.    That, on or about January 30, 2019, at night, MS. MOORE was driving her vehicle in the area of Joy and Stout Roads in Detroit, Michigan.

18.    That, at the time and place relevant hereto, the temperature was dangerously below freezing.

19.    That, at the time and place relevant hereto, MS. MOORE was pulled over and detained by Defendants STEELE and GARRISON.  The pre-text for the stop was the alleged absence of a proper registration tab, which is a civil infraction.

20.     That Defendants, STEELE and GARRISON, activated their emergency lights to initiate the stop.  MS. MOORE observed the emergency lights and pulled over.

21.     That Defendants, STEELE and GARRISON, wrote MS. MOORE a ticket for expired registration and confiscated the keys to her vehicle.

22.     That, at this point, Defendants, STEELE and GARRISON, gave MS. MOORE two (2) options; MS. MOORE could call someone to pick her up, and she could wait in her cold vehicle until they arrived, or MS. MOORE could walk home.

23.     That MS. MOORE was fearful of Defendants, STEELE and GARRISON, and wanted to leave as soon as possible.  As MS. MOORE walked away, Defendant STEELE used a camera phone and a social media platform to record MS. MOORE.

24.     That the video posted to Defendant STEELE's Snapchat account, showing MS. MOORE walking home.  The video has captions that read "What Black Girl Magic Looks Like" and "Celebrating Black History Month."  In addition, Defendants, STEELE and GARRISON, can be heard to say "Walk of shame.  In the cold" and "Bye, Felicia."




25.     That Detroit Police Chief, James Craig, acknowledged the derogatory way that MS. MOORE was treated and the fact that Defendants, STEELE and GARRISON, placed MS. MOORE in very real danger "… At that point, the officer makes the bad decision to make a Snapchat post saying 'Bye Felicia' and that's derogatory and that's not what we expect of our police officers.  On top of that, she's walking a very cold night, it's dark and now in my view, she's in harms way even if she only lived a block away." [1]

26.     That, likewise, Detroit Mayor, Mike Duggan, acknowledged the derogatory way that MS. MOORE was treated by stating, "[t]he treatment of 23-

---

[1] https://www.detroitnews.com/story/news/local/detroit-city/2019/01/31/detroit-police-officer-reassigned-investigated-racially-charged-social-media-post/2733757002/

year-old Ariel Moore was something that was deeply disturbing to everyone… Detroit police officers are sworn to protect our citizens, and it was sickening to watch Ms. Moore walking home in the cold while being mocked with racial comments…It's just not acceptable." [2]

27.    That Defendant CITY was well aware of Defendant STEELE's propensity of racism and violence towards women.

28.    That multiple other police officers testified at deposition that Defendants, STEELE and GARRISON, were "bad apples," and that even Detroit Police Chief, James Craig was aware of and witnessed some of the racial issues concerning Defendant STEELE first hand.

29.    That, in 2008, Defendant STEELE was charged with Physically Attacking his ex-girlfriend and firing a gun near her head in Canton, Michigan. Upon information and belief, Defendant STEELE plead guilty to a misdemeanor charge, served probation and was able to remain an employee of the CITY's police force.

30.    That, in 2017, according to Chief Craig, there are reports from a former officer that there is another video made by Defendant STEELE, where Defendant STEELE, according to Chief Craig, "[w]hen we reached out to him, he indicated

---

[2] https://www.detroitnews.com/story/news/local/detroit-city/2019/04/24/detroit-police-chief-cites-racially-tone-deafculture-6th-precinct/3554141002/

that (STEELE) had impounded a car during Christmas two years ago… [t]he kids had gifts, and while the kids were walking home carrying their gifts, (STEELE) supposedly made another Snapchat video saying 'walk of shame' and other racially-insensitive remarks." [3]

31.     That, in 2018, Defendant STEELE unlawfully broke the arm of another African American female, which is the subject of a pending/future lawsuit.

32.     That, likewise, "[GARRISON] also has had a checkered career.  In 2015, he was suspended for 60 days for shooting deer in Rouge Park while on duty. He was also among a group of officers who were sued in 2006 and accused of wrongfully stopping and harassing a 15-year-old boy.  The CITY settled the case." [4]

33.     That Defendant, CITY conducted an "audit" of the afternoon shift of the Sixth Precinct (the shift and Precinct where Defendants, STEELE and GARRISON, worked) and found some "problems" that "set the tone for that shift and did have an impact on younger officers."  Chief Craig also stated that he has "concerns on the leadership and supervision." [5] (See **Exhibit 1** – Executive Summary of Environmental Audit and **Exhibit 2** – Environmental Audit).

---

[3] https://www.detroitnews.com/story/news/local/detroit-city/2019/02/05/detroit-police-investigate-allegations-second-racist-video-cop/2776085002/
[4] https://www.detroitnews.com/story/news/local/detroit-city/2019/02/05/detroit-police-investigate-allegations-second-racist-video-cop/2776085002/
[5] https://www.detroitnews.com/story/news/local/detroit-city/2019/02/07/calls-fire-cop-who-posted-racist-video-premature-police-chief-says/2800360002/

34.     That, likewise, Defendant, CITY has been well aware of the systematic, ongoing and ratified racism that has permeated the CITY's police department for years.  Recently, the department's Committee on Race and Equality, a group of officers that was set up in 2016 to address racial issues recognized "embedded racial attitudes and behavior exhibited by some in the command staff."  Further, "[i]t was determined that the problems within the department were... top-down entrenched discriminatory practices. Simply put, the racism that exist(s) in the department trickles down from command officers to the rank and file," the report said.

35.     That the "audit" also found STEELE and GARRISON were the ringleaders of a small racist faction on the afternoon shift, who often referred to African Americans as "Keishas" and "Jakes."

36.     That, as part of the "audit," a review of the body camera footage of Defendants, STEELE and GARRISON, was conducted spanning from December 2018 through January 2019.  During this review, a number of racially motivated and violent incidents were discovered.

## COUNT I

## 42 U.S.C. § 1983 - DELIBERATE INDIFFERENCE
## (as to Defendants, STEELE and GARRISON)

37.     That Plaintiff hereby reincorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

38.     That, as a citizen of the United States, MS. MOORE was entitled to all rights, privileges and immunities accorded to citizens of the State of Michigan and of the United States.

39.     That, pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, MS. MOORE had a right to be free from cruel and unusual punishment while detained under Defendants' custody and control.

40.     That, at all relevant times, MS. MOORE had a right to adequate shelter and protection from freezing weather such that her life would be preserved and free from unconstitutional ridicule, harassment, racial discrimination, pain and suffering.

41.     That, Defendants, STEELE and GARRISON's, acts and omissions deprived MS. MOORE of her constitutional rights, including, without limitation:

    (a)     denying MS. MOORE reasonable shelter;

    (b)     taking MS. MOORE's vehicle and shelter;

    (c)     exposing MS. MOORE to dangerous subzero weather conditions;

    (d)     profiling MS. MOORE as an African American female to target her for harassment and force;

    (e)     publicly embarrassing and ridiculing MS. MOORE because she was an African American female; and,

(f)     any and all other breaches of legal duty as they become known
through the course of this litigation.

42.     That, Defendants' conduct, as described above, deprived MS. MOORE
of her rights, privileges and immunities in violation of the Eighth and Fourteenth
Amendments of the United States Constitution.

43.     That, as a direct and proximate result of Defendants' actions and
omissions, MS. MOORE suffered great physical pain, discomfort, fear,
embarrassment, humiliation, degradation, anguish and emotional distress.

44.     That, as a direct and proximate result of Defendants' acts and
omissions, MS. MOORE is entitled to compensation for the damages described
above and additional damages, such as wage loss, loss of earning capacity, past,
present and future costs, including medical costs, punitive damages, exemplary
damages, and statutory damages, including, but not limited to costs and attorney fees
available under 42 U.S.C. § 1981, 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

45.     That Defendants' conduct was and remains extreme and outrageous,
manifesting actual malice toward MS. MOORE.

## COUNT II

## 42 U.S.C. § 1983 - RACIAL DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1981
## (as to Defendants, STEELE and GARRISON)

46.    That Plaintiff hereby reincorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

47.    That 42 U.S.C. § 1983 provides that:

> "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…"

48.    That MS. MOORE is a citizen of the United States and all of the individual police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

49.    That all individual Defendants to this claim, at all ties relevant hereto, were acting under the color of state law in their capacity as Detroit police officers and their acts or omissions were conducted within the scope of their official duties or employment.

50.     That, at the time of the complained events, MS. MOORE had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

51.     That Title 42 U.S.C. § 1981 ("**Section 1981**") provides, in pertinent part:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

52.     That MS. MOORE, as an African American female, is a member of a protected class, and thus also had the clearly established statutory right under this provision of Section 1981 to be free from racially motivated searches, seizures and cruel and unusual punishment.

53.     That, any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

54.     That, MS. MOORE's race was a motivating factor in the decisions to stop her, search her, seize her vehicle and force her out into dangerous subzero weather.  Defendants' conduct was undertaken with the purpose of depriving MS.

MOORE of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment and Section 1981.

55.    That MS. MOORE's gender was a motivating factor in the decisions to stop her, search her, seize her vehicle and force her out into dangerous subzero weather.  Defendants' conduct was undertaken with the purpose of depriving MS. MOORE of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment and Section 1981.

56.    That Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of MS. MOORE's federally protected rights.

57.    That the acts and or omissions of all individual Defendants were moving forces behind MS. MOORE's damages.

58.    That these individual Defendants acted in concert and joint action with each other.

59.    That the acts or omissions of Defendants as described herein intentionally deprived MS. MOORE of her constitutional and statutory rights and caused her other damages.

60. That Defendants are not entitled to qualified immunity for the complained of conduct.

61. That Defendants to this claim, at all times relevant hereto, were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage or practice in their actions pertaining to MS. MOORE.

62. That, as a proximate result of Defendants' unlawful conduct, MS. MOORE has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.  As a further result of the Defendants' unlawful conduct, MS. MOORE has (or will) incurred special damages, including medically related expenses and may continue to incur further medical and other special damages, in amounts to be established at trial.

63. That, as a direct and proximate result of Defendants' acts and omissions, MS. MOORE is entitled to compensation for the damages described above and additional damages, such as wage loss, loss of earning capacity, past, present and future costs, including medical costs, punitive damages, exemplary damages, and statutory damages, including, but not limited to costs and attorney fees available under 42 U.S.C. § 1981, 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

64. That, in addition to compensatory, economic, consequential and special damages, MS. MOORE is entitled to punitive damages against each of the

individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional and statutory rights of MS. MOORE.

## COUNT III
## 42 U.S.C. § 1983 – MONELL LIABILITY:
## DEFENDANTS CITY OF DETROIT & OFFICERS STEELE and GARRISON

65.     Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

66.     At all times relevant, Defendants STEELE and GARRISON was high senior officers for the DPD's 6th Precinct.

67.     At all times relevant, Defendants failed to train, discipline and supervise DPD officers, including Defendants STEELE and GARRISON, and/or encouraged the officers to violate federal and state laws without regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

68.     At all times relevant, Defendants refused to provide DPD officers, including Defendants STEELE and GARRISON, any training, discipline and supervision with regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States

Constitution; refused to provide the officers with supervision and discipline to protect the constitutional rights of citizens; and refused to require the officers to follow policies and procedures and state and federal law relating to the right of an unarmed citizen.

69.     At all times relevant hereto, Defendants refused to provide DPD officers, including Defendants STEELE and GARRISON, with any training, discipline, and supervision with regard to ethnic, racial and gender sensitivity issues.

70.     At all times relevant, Defendants knew, or should have known, that the policies, procedures, training, supervision, and discipline of DPD officers, including Defendants STEELE and GARRISON, were inadequate for the tasks that each Defendant was required to perform.

71.     At all times relevant, there was a complete failure to train, supervise and discipline DPD officers, including Defendants STEELE and GARRISON.  The inadequate training, inadequate supervision, and lack of discipline were so reckless, that future violations of the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, were certain to occur.

72.     At all times relevant, Defendants were on notice and knew that its failure to train, discipline, and supervise its officers, including Defendants STEELE and GARRISON, with regard to the constitutional rights of citizens to be free from

violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, lead to the violation of detainee's constitutional rights.

73.     At all times relevant, Defendants' response to this knowledge was so inadequate as to show a complete disregard for whether its DPD officers, including Defendants STEELE and GARRISON, would violate the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

74.     Defendants implicitly authorized, approved, and/or knowingly acquiesced in the excessive force, cruel and unusual punishment, and the disparate treatment DPD officers, including Defendants STEELE and GARRISON, engaged in against citizens and detainees on the basis of their race and/or sex,  and knew, or should have known, that such treatment did, and would continue to, deprive citizens and detainees of their constitutional rights.

75.     At all times relevant, Defendants engaged in a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, of which Defendants knew or should have known.

76.     At all times relevant, Defendants knew, or should have known, of the following, <u>non-exhaustive</u> list of incidents in which Defendant STEELE violated the Constitutional rights of US citizen and/or detainee:

(a)     *IAU #01-186*: In 2002, Defendant Steele was found guilty of improper conduct for mistreating and threatening a cab driver;

(b)     *IAS #03-209* (Victim L.P.): In 2003, Defendant Steele violently tackled Ms. Parsons from behind, threw her to the ground in or near a crosswalk adjacent to Comerica Park, and caused serious injury to her leg, in response to L.P. disobeying the Don't Walk signal and/or his similar verbal commands not to cross the street;

(c)     *FL #08-008; DF 09-0486* (Victim K.G.): In 2008, Defendant Steele was charged with seven felonies after he violently assaulted and tortured his girlfriend as follows:

A.      struck her in the right thigh with a baseball bat, bringing her to her knees;

B.      picked her up by the throat and dragged her across the garage floor;

C.      smashed her head through the garage wall, choked her and pushed her through the door;

D.      jumped on top of after she fell onto her back, held her by the throat, and repeatedly pushed her head into the floor while screaming "Now I know why (my former police partner) did what he did (commit suicide)"!"

E.      Drew his revolver and fired three shots into the floor next to her head;

F.      Placed his gun to her left eye and stated "I will kill you";

G.      Told her to open her mouth and let him blow her brains out;

{01223380.DOCX}                                    19

(d)    *UF002 9495; FL 11-054; DF 12-0549* (Victim Gary Musser): In October of 2011, Defendant Steele punched a defenseless, restrained (handcuffed behind his back), detainee in the mouth, who was sitting in the back of a patrol car.

(e)    Defendant Steele had multiple Citizen Complaints made against him between 2003 and 2019, which included complaints of excessive force and/or improper conduct, many of which were made by women and minorities.

77.    Defendants tolerated its officers' repeated violations, including Defendant STEELE's, of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, which allowed the officers, specifically, STEELE, to continue to engage in this unlawful behavior.

78.    Defendant GARRISON also has had a checkered career. In 2015, he was suspended for 60 days for shooting deer in Rouge Park while on duty. During those proceedings he LIED about the incident. Defendant Garrison appeared before a Police Trial Board and was guilty of 1) Conduct Unbecoming An Officer (i.e., on December 10, 2009, shot a deer while in a public park with a 20 gauge shotgun and a bow gun; did, recklessly, heedlessly and willfully discharge a shotgun at a deer in a public park violating Michigan Compiled Law MCL742.863a and hunted a deer causing himself to be criminally investigated by the Michigan State Police Department of Natural Resources), 2) Unjustified or Careless Use Of Firearm or Weapon (i.e., carelessly and unjustifiably discharge a shotgun in a public park) and 3) Willfully Making A False Oral. Written Statement or Report (i.e., willfully make

false oral statements during a Garrity interview). The recommendation of the Police Trial Board was dismissal from the Detroit Police Department. An Arbitration hearing was held on January 28, 2015 and Officer Garrison's sentence was reduced to sixty (60) days suspension from the Department without pay and benefits.  He was also among a group of officers who were sued in 2006 and accused of wrongfully stopping and harassing a 15-year-old boy. The city settled the case.

79.     Defendants' failure to act in response to repeated complaints of constitutional violations by its officers, including Defendants STEELE and GARRISON, amounts to Defendants' acquiescence and ratification of the unconstitutional conduct exhibited by Defendants.

80.     Instead of terminating Defendants STEELE and GARRISON from the force following repeated excessive force complaints, citizen complaints, and/or Constitutional violations, DPD retained Defendants STEELE and GARRISON and promoted STEELE to Corporal. As a Corporal, STEELE was tasked with training new recruits to the Sixth Precinct.

81.     Defendants refused to discipline officers who violated citizens' constitutional rights to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution; failed to fully investigate allegations of misconduct, looked the other way, and thus, tacitly encouraged such behavior.  In doing so, Defendants condoned, ratified or encouraged the officers' staff to violate

the Fourth, Eighth and Fourteenth Amendments to the United States Constitution as a matter of policy.

82.     Defendants' unconstitutional policies and customs were the moving force in Defendant STEELE'S use of excessive force against Plaintiff, MURRIEL, which resulted in severe and permanent damages.

83.     That the unconstitutional polices and customs showcased by Defendants STEELE and GARRISON were so engrained into the Sixth Precinct, that an Internal Environmental Audit was conducted in 2019 to increase awareness regarding morale, identify positive trends that might serve as examples to other commands, and to troubleshoot deficiencies so they might be resolved most expeditiously.

84.     As a result of the Environmental Audit conducted by Defendant City of Detroit, the following relevant conclusions related to Defendants STEELE and GARRISON were drawn by DPD:

(a)     Body Worn Camera (BWC) video showing STEEL and GARRISON's arrest of two black females and one black male where Steele is heard saying to another officer that he had, "Two 'Keisha's' and one 'Homie' to go."

(b)     STEELE, and GARRISON in the 6th Precinct, regularly referred to black females as "Keisha";

(c)     GARRISON roughly shoving a handcuffed elderly black female into the back seat of the scout car;

(d)     GARRISON making insensitive remarks to his partners to mock motorists as their vehicles were towed. Notably, GARRISON is overheard saying, "And that's a walk of shame." In this instance, GARRISON had conducted a traffic stop of a black male.

(e)     STEELE making insensitive remarks to mock motorists as their vehicles were towed. Notably, Steele is overheard saying to his partner, "I usually wait until about 10:30 p.m. to give them the walk of shame." In this instance, Steele has conducted a traffic stop of a black female.

(f)     The behavior of Defendant STEELE, who was then a Corporal, contributed to the racial undertones of the precinct and may have passed on to other officers' conduct that was insensitive and discourteous toward citizens based on their race;

(g)     When asked about the social culture at the Sixth Precinct and if they had concerns related to security and race, several officers stated that people of color were very uncomfortable with Platoon 3, which was STEELE and GARRISON'S Platoon;

(h)     Some members stated that firing Defendant STEELE and GARRISON would establish a policy on racial discrimination and the zero-tolerance policy;

(i)     All of the officers assigned to the Sixth Precinct should receive mandatory discrimination, and sensitivity training;

(j)     The nature of past civil lawsuits involving STEELE and GARRISON relate to Constitutional Rights violations;

(k)     The overall findings concerning STEELE and GARRISON'S performance record displayed conduct that is contrary to the standards reasonably expected of sworn Officers; and

(l)     New officers trained by STEELE should receive additional training in customer service, implicit bias, and constitutional policing due to their exposure to Steele and his influence on their field training experience.

85. The DPD Executive Summary also noted concern that STEELE and GARRISON routinely made traffic stops after 9:30 p.m. to avoid priority calls late in the evening. Black motorists were overwhelmingly the subject of these traffic stops and were typically issued tickets and / or had their vehicles towed. Furthermore, there were also several notable instances where one or both of their body worn cameras were turned off.

86. The DPD Executive Summary also noted that the concerning trends noted above occurred with great frequency. Regular review of body worn camera footage would have revealed much of this disturbing behavior. The fact that such reviews were not taking place (**or worse yet, the conduct was simply ignored**) represents a **programmatic failure starting with the members' immediate supervisors and ending with the command officers**.

87. The DPD Executive Summary also notes that **the behaviors noted above were ratified and approved by upper command at DPD**.

88. Specifically, the DPD Executive Summary findings suggest the command officers may have known, or at least should have known, about the racially insensitive behavior, which was referred to during the audit as the precinct's **"dirty little secret."**

89. The DPD Executive Summary also "revealed a common view held by many rank-and-file members that STEELE and GARRISON engaged in racist

acts."… **"The command officers did not institute corrective action plans to address this issue. The recurring themes established during the audit revealed evidence that <u>the conduct was at least tolerated and accepted</u>."**

90.     That despite the corrosive and unconstitutional behavior of Defendants STEELE and GARRISON throughout their careers at DPD, they were retained as senior officers, which perpetuated a belief within the department that supervisors and senior officers were accepting and approved of STEELE and GARRISON's racist and sexist behavior with civilians.

91.     That the conduct of the aforementioned Defendants, individually, corporately and as agents of said individual Defendants, deprived Plaintiff of her clearly-established rights, privileges, and immunities guaranteed her under the United States Constitution, specifically those set forth under the Fourth, Eighth and Fourteenth Amendments to same, as evidenced by the following particulars:

    (a)    Permitting Plaintiff and other citizens and/or detainees to be subject to racism and sexism as well as cruel and unusual punishment, in violation of the Fourth, Eighth and Fourteenth Amendments;

    (b)    Failing to properly train, supervise, discipline the officers on its force to ensure the above breaches / deviations, unconstitutional conduct were not committed;

    (c)    Tolerating the conduct of officers when it was apparent that there was a pattern of treatment of persons in a manner consistent with racism, sexism and cruel and unusual punishment and in violation of the Fourth, Eighth and Fourteenth Amendment;

92.    That, as a proximate result of Defendants' unlawful conduct, MS. MOORE has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.  As a further result of the Defendants' unlawful conduct, MS. MOORE has (or will) incurred special damages, including medically related expenses and may continue to incur further medical and other special damages, in amounts to be established at trial.

93.    That, as a direct and proximate result of Defendants' acts and omissions, MS. MOORE is entitled to compensation for the damages described above and additional damages, such as wage loss, loss of earning capacity, past, present and future costs, including medical costs, punitive damages, exemplary damages, and statutory damages, including, but not limited to costs and attorney fees available under 42 U.S.C. § 1981, 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

94.    That, in addition to compensatory, economic, consequential and special damages, MS. MOORE is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional and statutory rights of MS. MOORE.

### *PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiff demands judgment against the Defendants in an amount in excess of seventy-five thousand ($75,000.00) dollars, together with costs, interest and attorney fees.  In addition, Plaintiff requests all damages noted above. In addition, Plaintiff prays that this Honorable Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.    Economic losses on all claims allowed by law;

C.    Past, present and future wage loss;

D.    Past, present and future expenses, including medical expenses;

E.    Loss of earning capacity;

F.    Special damages in an amount to be determined at trial;

G.    Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

H.    Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1981; 42 U.S.C. § 1983; and/or 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

I.      Pre- and post-judgment interest at the lawful rate; and,

J.      Any further relief that this court deems just and proper, and any

other appropriate relief at law and equity.


Respectfully submitted,

**FIEGER, FIEGER, KENNEY &
HARRINGTON, P.C.**


Dated:  January 11, 2022          By:  /s/ Gregory W. Wix
                                  Geoffrey N. Fieger (P30441)
                                  Gregory W. Wix (P65424)
                                  Attorneys for Plaintiff
                                  19390 West Ten Mile Road
                                  Southfield, Michigan 48075
                                  Phone:  (248) 355-5555
                                  g.wix@fiegerlaw.com

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARIEL MOORE**,

    Plaintiff,

        v

                          Case No.
                          Judge
                          Magistrate

**CITY OF DETROIT**, a municipal corporation, **GARY STEELE**, and **MICHAEL GARRISON**

    Defendants.

---

*FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.*
By:  Geoffrey N. Fieger (P30441)
     Gregory W. Wix (P65424)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
Phone:  (248) 355-5555
Fax:  (248) 355-5148
Email:  g.wix@fiegerlaw.com

---

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, ARIEL MOORE, by and through his attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., and hereby demands a trial by jury in the above-captioned matter.

Respectfully submitted,

**FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.**

Dated:  January 11, 2022          By:  /s/ Gregory W. Wix
                                   Geoffrey N. Fieger (P30441)
                                   Gregory W. Wix (P65424)
                                   Attorneys for Plaintiff
                                   19390 West Ten Mile Road
                                   Southfield, Michigan 48075
                                   Phone:  (248) 355-5555
                                   g.wix@fiegerlaw.com

# EXHIBIT 1

# Executive Summary



### MISSION STATEMENT
The Detroit Police Department is a model of sustained policing excellence that our neighborhoods and people first.

James E. Craig
Chief of Police

# ENVIRONMENTAL
# AUDIT

6th Precinct

# Table of Contents

## Contents

I.      BACKGROUND ..................................................................................................................2

        CORE Report ..................................................................................................................3

        Social Media Post..........................................................................................................6

        Investigation by the Professional Standards Bureau.....................................................6

        Environmental Audit......................................................................................................7

II.     METHODOLOGY ..............................................................................................................8

III.    FINDINGS ......................................................................................................................10

        Audio / Video Review .................................................................................................. 11

        HR Assessment ........................................................................................................... 12

        Facilities Assessment.................................................................................................. 13

IV.     TRAINING DENIALS BASED ON RACE .............................................................................14

V.      VIEWS OF MANAGEMENT .............................................................................................14

        Captain A .................................................................................................................... 15

        Captain B .................................................................................................................... 15

        Captain C..................................................................................................................... 16

VI.     CONCLUSIONS ..............................................................................................................16

VII.    CORRECTIVE ACTION STRATEGIES.................................................................................17

        a.   Training for 6th Precinct Personnel.......................................................................... 18

        b.   Better Communication from Front Line Supervision.................................................. 19

        c.   Command Officers and Senior Management.............................................................. 20

        d.   Human Resources Personnel.................................................................................... 20

        e.   Fleet........................................................................................................................ 20

        f.   Professional Education and Training ......................................................................... 21

        g.   Resource Management............................................................................................. 21

VIII.   FIGURE 1 ......................................................................................................................21

IX.     FIGURE 2 ......................................................................................................................22

# Executive Summary

*"The Department's goal at this juncture is to ensure that racially-driven proclivities within the rank and file and management are responsibly addressed and that command officers be held accountable for the environments they are charged with fostering."*

\* \* \* \* \*

*"This report sets forth a number of recommendations that will be described more fully below. One order, however, shall be set forth here in clear and undeniable terms. All members of the Department shall be responsible for promoting an environment that promotes a guardian mentality that comprehends all walks of life. Furthermore, no member shall be permitted to engage in behavior that is demeaning toward anyone's race, gender, sexual orientation, or other form of identity. The attempt by any member to attribute such behavior to "locker room banter," "shop talk," or to other purported settings or occasions shall be viewed by the Department as an admission to the underlying offense."*

## BACKGROUND

Since his appointment in 2013, Chief of Police James E. Craig has committed himself and the Detroit Police Department to practices that are constitutional, transparent, fair, and equitable. For more than six years now, the City has seen remarkable progress within its police department, including—

1. The final resolution of the Department's Federal Consent Decrees;

2. Policy reforms in the area of use of force, stop and frisk, bias-based policing, and discrimination;

3. Restructuring that ensured that the Department's Senior Management Team and Command Staff were both qualified and representative of the community;[1]

4. The implementation of technology that would better monitor the performance of officers out in the field, including body worn cameras, improved scout car cameras, and improved reporting systems;

5. Innovative programs, such as Cease Fire and Project Green Light that involve citizens and business stakeholders in the Department's crime-suppression efforts;

---

[1] See Figure 1.

6. Aggressive recruiting programs that seek out willing and able Detroit residents and other individuals of diverse origins and backgrounds to serve in the Department;[2]

7. The assembly of special committees that enable Chief Craig and the Senior Management Team to hear the perspectives of both rank and file members as well as community groups; and

8. Regular public reports on the status of the Detroit Police Department, particularly in times following controversial incidents.

This commitment to transparency and policy of constitutional policing serves a very important purpose. History has shown and continues to show that local governments, police agencies in particular, cannot function effectively without the support of its citizenry. Seldom are serious crimes solved without the courage and commitment of crime victims and witnesses. It goes without saying, therefore, that maintaining a bridge between the Department's members and the community it serves is paramount to the Department's crime suppression efforts. It is Chief Craig's hope that this report will be just another step in cementing that bridge that keeps members of the Detroit Police Department close to Detroit's deserving community.

## CORE Report

In 2016, a verbal argument between black officer and a white officer over supervisory recognition of superior work performance occurred at the Detroit Police Department's 6th Precinct. There is no doubt that at least some perceived racial animus as the root of the argument. To help give this perception, and similar perceptions throughout the Department some form, Chief Craig instituted the Committee on Race and Equality (C.O.R.E.). The mission of C.O.R.E. was to seek out and bring to light perceptions of animus within the Department's rank and file that were based on factors such as race, gender, and sexual orientation.

It is important to note that C.O.R.E.'s mission was to serve in an advisory capacity to the Chief of Police and to bring to light their perceptions of animus and concern from within the rank and file. C.O.R.E. was, essentially, a committee of inquiry with the ability to provide the Chief with recommendations. The committee consisted solely of department members willing to participate on a volunteer basis. Many committee members did not have formal training in investigations or audits.

No command officers or senior managers were permitted to sit on the committee. This was an intentional decision. It was determined after much thought and deliberation that the presence of high-ranking members on the committee would likely have curbed the free flow of ideas, or worse yet, resulted in disingenuous behavior by members of the committee. It was important that members of the committee report be permitted to report without hesitation their

---

[2] *Id.*

perceptions of the mood of the rank and file. The personal comfort of each committee member was, therefore, of utmost importance.

While this lack of formality and command oversight was by design and aimed toward a beneficent end, there were drawbacks. C.O.R.E. could not issue findings on which significant personnel or operational changes could be based. The committee itself appeared to acknowledge this when it expressed that it was not a replacement for the work of professional investigative entities or processes established under the appropriate collective bargaining agreement.[3]

The distinction between the committee's role as a panel of inquiry as opposed to an investigative role on which important decisions pertaining to personnel or operational matters could be made is an important one. An investigation, for example, is an inquiry into a particular incident for the primary purpose of initiating disciplinary or other corrective action should it be determined that an allegation of misconduct is supported by the weight of the evidence. Members that work as investigators are often specially trained and supervised, particularly when the investigation deals with internal matters. This is to ensure that the rights of members are protected and that prior to providing information, the member has a clear understanding of the particular area of concern and the consequences that may follow should the member deviate from the truth. Investigators assigned to Internal Affairs and Force Investigations conduct many of the Department's internal investigations.

Closely related to investigations are audits. Unlike formal investigations, however, audits are generally used within the Detroit Police Department to track patterns and trends. Like investigators, auditors have special training and are particularly adept at identifying risk patterns based on pre-determined variables that must be carefully identified prior to initiating the audit. Audits are often performed with the help of the team or unit being audited to avoid miscalculation or misunderstanding with respect to the data sample. The Audit Team of the Department's Civil Rights Division conduct most of the Department's internal audits. Although audits may give rise to a specific issue requiring additional investigation that may result in discipline, few personnel decisions are made based solely on audit findings.

In August 2016, C.O.R.E. issued its summary report that included several incidents where there were perceptions of discriminatory practices. The report included, among other things, the perceptions of several members of the Department that command officers and senior managers were engaged in intimidation and retaliatory practices, as well as, the denial of training opportunities to African American members. A handful of command officers and senior managers were named as being, "virtually continuously the center of discussion when it came to disparate treatment of African Americans."

Chief Craig ultimately directed that the C.O.R.E. report be vetted. A subsequent examination of the report revealed that many of the conclusions drawn from the report were based largely on

---

[3] See *Investigative Summary with Recommendations from the Committee on Race and Equality (CORE)* (2016).

innuendo. Moreover, the report lacked specificity and did not amount to a thorough and complete investigation on any particular matter. For example—

- Specific members were not listed, which greatly hindered the Department's ability to follow up on the issues reported;

- There did not appear to be any effort to measure the reliability of any particular allegation;

- Findings were highly generalized;

- The report did not adequately reveal how many members were interviewed or the degree to which accounts varied;

- The date, time, and circumstances of the interviews were not recorded;

- The specific questions posed to individual members were not revealed; and

- Further inquiry into several of the matters reported in the C.O.R.E. report cut against the committee's findings.

Ultimately, no adverse action was taken against any member of the Department based solely on what was contained in the C.O.R.E. report. Neither the C.O.R.E. report nor subsequent inquiry has yielded any evidence of disparate treatment of rank-and-file members by any of the command officers or senior managers named in the report.

Despite procedural shortcomings, however, the report would not be discounted altogether. Although it was difficult to quantify the extent of the issue, the report did establish that there were feelings within the rank and file of racial animus. At the very least, the perceptions were real in the eyes of the individuals who were willing to discuss them. To help address this, Chief Craig ordered that C.O.R.E. become a permanent committee and that directed training concerning biases and discriminatory practices be implemented throughout the Department.

In addition to establishing more training directed at addressing bias-based and discriminatory practices, Chief Craig ordered further audits of various units within the Department. These "environmental audits" were an attempt to link performance (both good and bad) to a particular unit's or section's environment, which included facilities, equipment, leadership, supervision, performance trends, and morale. The underlying theory of an environmental audit is that a poor environment can negatively impact an officer's performance. Substandard facilities and equipment can result in a general feeling of isolation, separation, indifference, and callousness. Poor leadership or lack of set expectations can lead to unconstitutional practices within a particular unit. Poor supervision invariably result in a loss of work quality and a sense of accountability.

In retrospect, the Department may have benefited from deliberately including trained investigators or seasoned auditors on C.O.R.E. This being said, the original intent behind the formation of C.O.R.E. was to obtain the thoughts and impressions of individuals willing to volunteer time during their busy work schedules to interact with some members of the rank and file.

Whether a more rigorous approach to the situation following the argument at the 6th Precinct would have stopped some of the occurrences set forth below will, no doubt, be the subject of much debate. The Department's goal at this juncture is to ensure that racially-driven proclivities within the rank and file and management are responsibly addressed and that command officers be held accountable for the environments they are charged with fostering.

### Social Media Post

In February 2019, reports surfaced that a member of the Department had posted video on "Snapchat," a social media site. The video showed a very disturbing sequence of events. Two members of the Detroit Police Department initiated a traffic stop on a vehicle operated by a black female. During the course of the traffic stop, the motorist had to walk home by herself in freezing temperatures while the vehicle she had been driving was impounded. As this occurred, one of the involved members began recording the incident on his cell phone. As the incident was being recorded, the officers were heard mocking the motorist as she walked away. The commentary included statements such as, "Priceless" and "Bye Felicia." The video was edited to include a caption containing the words "What black girl magic looks like" and "Celebrating Black History Month."

The post was picked up by a number of news and radio stations and soon went viral. In response to this incident, Chief Craig ordered two separate but parallel inquiries. First, there would be an internal investigation by the Department's Professional Standards Bureau into the specific acts of the involved members for purposes of determining whether criminal and / or disciplinary action should be initiated. Second, there would be an environmental audit of the 6th Precinct's environment for purposes of determining the relative "health" of the 6th Precinct and its members and to see if there were any aspects of the environment that contributed to the circumstances surrounding the February incident.

### Investigation by the Professional Standards Bureau

The investigation conducted by the Professional Standards Bureau focused primarily on the actions of the officers during their interaction with the black female motorist. Like all departmental investigations, this investigation would conclude with findings on whether there was sufficient evidence to warrant disciplinary proceedings and / or referral to the Wayne County Prosecutors Office.

The Professional Standards Bureau's investigation spanned a number of weeks. During this time, citizens and community leaders called for the summary dismissal of the involved members. Summary dismissal was not an option, however, given that the involved members were both

tenured officers that were entitled by law and contract to due process and an opportunity for a hearing. Premature official action by the Chief of Police could prove fatal to any future attempt to discipline the involved members. Clearly aware of this, Chief Craig endeavored to promote feelings of patience and civic trust within the community through transparent reporting to the community and to the Board of Police Commissioners.

Ultimately, the Professional Standards Bureau issued a comprehensive report with in-depth findings. The report itself spanned more than 100 pages in length. Although investigators determined that the stop and subsequent impoundment of the motorist's vehicle was lawful, it was also determined that the member's conduct during the course of the traffic stop constituted gross violations of Department policy, including Conduct Unbecoming an Officer and Willfully Making False Oral or Written Statements.

In accordance with the involved members' collective bargaining agreement, two separate Chief's Hearings were convened to hear the disciplinary matter as it pertained to each of the involved members actions during the February incident. Upon presentation of the evidence that had been gathered during the course of the Professional Standards Bureau's investigation, the Chief ordered both members DISMISSED from the Detroit Police Department. Following each members respective dismissal, Chief Craig held a press conference to report his actions to the members of the community and other interested parties.

Pursuant to their collective bargaining agreement, both members will have the opportunity to appeal the dismissal to arbitration.

### Environmental Audit

The environmental audit of the 6th Precinct constituted the second prong of the Chief's inquiry into the incident. Like other environmental audits, the specific focus was less on the particular incident itself and was more focused on patterns or trends within the 6th Precinct's environment that may have contributed to the circumstances leading up to the February incident and the subsequent posting of the Snapchat video. The comments in the video were clearly racially inflammatory, and the taunting of the black female motorist during the course of the traffic stop evidenced a callous attitude toward the well-being of a young Detroit resident causing her to walk through freezing temperatures to reach a safe place. The incident itself was serious and warranted the dismissal of the involved members. But equally concerning was whether similar tendencies existed within the 6th Precinct and the degree to which the environment contributed to the incident. These were the concerns that ultimately prompted Chief Craig to call for this in-depth environmental audit.

The Environmental Audit of the 6th Precinct was launched in February 2019 under the Office of Support Operations. The audit would be conducted by three separate committees that totaled 24 members with competencies in areas such as —

- Performance audits

- Risk assessment

- Human resources

- Professional education and training

- Facilities

- Fleet management

- Body-worn camera technology.

During the course of the environmental audit, each subcommittee conducted reviews specifically related to their area of responsibility. The Office of Support Operations headed the audit, tracked the progress of each subcommittee, and reviewed each committee's findings.

## METHODOLOGY

The purpose of the environmental audit was to assess the general "health" or "well-being" of the precinct and its members. In conducting this audit, the Department endeavored to conform its methodology to Generally Accepted Government Auditing Standards. The scope of the audit was broad and included a variety of auditing techniques, including—

- Review and analysis of reports and other documents;

- Review and analysis of video footage;

- Interviews;

- Facility (infrastructure) assessments;

- Equipment inspections;

- Staffing assessments;

- Personnel reviews (including performance and disciplinary histories);

- Compliance reviews; and

- Operational assessments.

Interviews comprised a significant portion of the audit. Although the Department made every reasonable effort to give everyone an opportunity to share their perceptions, it was not possible to interview every member of the 6th Precinct. Some members were unavailable on the dates the

interviews were conducted. Reasons for a member's absence ranged from members being on furlough (vacation) to extended sick leave. During the audit period, more than 88 individuals were interviewed, some of whom were interviewed multiple times, leading to more than 100 interviews in total.

Participation in the interview process was voluntary. Interviews were conducted using open-ended questions that would permit the free expression of each member's perceptions, opinions, and beliefs. Questions were geared toward obtaining information about the culture of the precinct, including the morale of the members, the effectiveness of management, and concerns of racial animus amongst the precinct's rank and file.

The object of each question posed during the interview process was determined in advance to help ensure responses could be tracked and categorized. Some questions were asked to help the auditor understand the extent a particular member was familiar with his / her supervisor and command staff. For example—

- The members were asked if they knew who their span of control supervisor was;

- The members were asked about interactions with their span of control supervisor;

- The members were asked if they knew their captain and commander;

- The members were asked if they had witnessed members who were not supervised effectively;

- The members were asked if they knew the captain and commander had an open door policy; and

- The members were asked whether they recalled receiving their performance evaluations.

Other questions were geared toward understanding each member's views about their precinct. For example—

- The members were asked what they liked most about their command;

- The members were asked what they liked least about their command; and

- The members were asked what they would change if they had the ability to change anything at the 6th Precinct.

The auditors covered the members' perception of their work culture and working relationships at the precinct. For example—

- The members were asked about the social culture at the 6th Precinct and whether they had concerns related to security and race;

- The members were asked to describe the work relationship between DPD members on their platoon / shift;

- The members were asked if they felt comfortable communicating and socializing with peers assigned to the same platoon;

- The members were asked if there were racial overtones within the 6th Precinct;

- The members were asked if there was a divide among members assigned to the 6th Precinct; and

- The members were asked if they had received training on racial discrimination and hostile work environment.

The auditors also covered matters pertaining to specific concerns of each member. For example—

- The members were asked if they were left out of certain training because of race;

- The members were asked if a DPD member had ever directed any retaliatory tactics towards them or other officers;

- The members were asked if they had witnessed unethical behavior by other DPD members;

- The members were asked if they have noticed preferential treatment for some DPD members; and

- The members were asked if they have ever requested a transfer and the request was denied.


## FINDINGS

The purpose of the environmental audit of the 6th Precinct was to assess the "health" and "well-being" of the precinct and its personnel by looking for patterns and trends operating within the precinct's environment. Evidence of individual misconduct, though not discounted by auditors, was to be referred to the appropriate investigative entity. Moreover, individual instances of failure on the part of a particular member were not considered as important as programmatic failures within the precinct's operations or command structure.

There were several trends that are worth noting at the onset. First, the views of younger members tended to be different than more veteran members. Moreover, some opinions seemed to be formed based solely on one articulable negative experience. At times, one member's negative opinion was contradicted by another member's positive opinion. Regrettably, some members expressed that they felt too uncomfortable to elaborate or disclose details about their concerns when they were interviewed by the subcommittee groups. Despite these variances, the information gathered from the interviews, data analysis, and video revealed what the subcommittees viewed as programmatic failures within the environment.

Based on all of the information contained in this report, the Department concludes that the 6th Precinct is racially divided. Although this racial division does not appear to be widespread throughout the entire precinct, the amount of racial division exists at a level warranting further corrective measures.

### *Audio / Video Review*

The Body Worn Camera Team of the Civil Rights Division reviewed body worn camera for Corporal Gary Steele and Police Officer Michael Garrison. The review spanned from December 2018 through January 2019. There were a number of incidents that combined to form a concerning trend. For example, on December 4, 2018, Corporal Steele and Officer B initiated a traffic stop for defective headlights. Body worn camera footage revealed that during the course of the stop, Corporal Steele instructed Officer B not to write the motorist for operating an uninsured motor vehicle but to write a citation for merely failing to produce evidence of insurance. The given reason for this unusual exercise of discretion was the fact that it was late.

On December 6, 2018, Corporal Steele and Officer Garrison initiated a traffic stop for expired plates. During the course of the stop, one of the members is heard say, "Think it's a Keisha." And on December 11, 2018, Corporal Steele and Officer Garrison initiated a traffic stop for operating a vehicle with an obscured plate. During the course of the stop, Officer Garrison is heard saying, "Another Keisha." One of the members issued citations for operating an uninsured motor vehicle and operating without a valid driver's license and the vehicle was towed.

Other notable incidents included the following—

- Corporal Steele making taunting statements towards a black female motorist which were racially inflammatory after he had stopped her for a traffic violation and towed her vehicle, then posting on social media.

- Body Worn Camera (BWC) video showing Corporal Steele and his partner, Officer Garrison's arrest of two black females and one black male where Steele is heard saying to another officer that he had, "Two 'Keisha's' and one 'Homie' to go."

- Corporal Steele and Officer Garrison referring to black females as "Keisha" on multiple occasions.

- Officer Garrison striking a handcuffed black male while he was seated in the back of the scout car.[4]

- Officer Garrison roughly shoving a handcuffed elderly black female into the back seat of the scout car.[5]

- Officer Garrison making insensitive remarks to his partners to mock motorists as their vehicles were towed. Notably, Officer Garrison is overheard saying, "And that's a walk of shame." In this instance, Officer Garrison had conducted a traffic stop of a black male.

- Corporal Steele making insensitive remarks to mock motorists as their vehicles were towed. Notably, Corporal Steele is overheard saying to his partner, "I usually wait until about 10:30 p.m. to give them the walk of shame." In this instance, Corporal Steele has conducted a traffic stop of a black female.

Also of notable concern was the observation that Corporal Steele and Officer Garrison appeared to routinely make traffic stops after 9:30 p.m. to avoid priority calls late in the evening. Black motorists were overwhelmingly the subject of these traffic stops and were typically issued tickets and / or had their vehicles towed. Furthermore, there were also several notable instances where one or both of the body worn cameras were turned off, though it is not entirely clear why.

The concerning trends noted above occurred with great frequency. Regular review of body worn camera footage would have revealed much of this disturbing behavior. The fact that such reviews were not taking place (or worse yet, the conduct was simply ignored) represents a programmatic failure starting with the members' immediate supervisors and ending with the command officers.

### *HR Assessment*

Human Resources conducted interviews with 82 members ranging in rank from commander to police officer to civilian personnel. Members participating in interviews were promised a qualified form of anonymity. The interviews revealed the following trends:

- The majority of employees enjoyed working at the 6th Precinct and viewed fellow members as family. Most officers worked with partners they had selected;

- Supervisors regularly made police runs. The current commander was also noted as making police runs;

- The majority of employees expressed that backup responds after being requested; and

- The precinct is short on manpower and overtime is frequently utilized.

---

[4] This incident is pending an Internal Affairs investigation.
[5] This incident is pending an Internal Affairs investigation.

Environmental
Audit
Sixth Precinct

The following concerns were shared by a small number of members:

- There were no female supervisors assigned to the 6th Precinct, and there are shifts on which no female police officers serve;

- There were officers emitting a negative or racist vibe;

- There were racial issues in the past and that the commanding officer was part of the problem; and

- There were supervisors that knew about problem officers but failed to take corrective action.

Other concerning observations included the following:

- Citizen complaint data revealed a pattern of allegations against two new officers who were potentially influenced by the behavior of Corporal Steele due to his training them.

- A supervisor indicated that the social culture of the precinct was divided amongst officers and that hostilities were based on race. The supervisor went further to state that, "Crosses were not being burned in the lobby and that some people mesh and some don't." This supervisor attributed the divisiveness to differences in personal backgrounds and state "Solutions would be made as they go."

### *Facilities Assessment*

Interviews revealed that the physical environment was a major issue amongst members assigned to the 6th Precinct. At the time of the interviews, the front lobby reportedly required "a facelift," including new furniture. Members reported a number of concerns they viewed as safety issues. There were also remnants that remained from the 2011 shooting incident occurring at the station. Some complained of odorous fumes emanating from the toilets of the old cell block. The garage reportedly emitted odors resulting from an accumulation of bird feces.

Since the audit, renovation efforts have begun at the 6th Precinct.[6] The precise impact that these and other conditions had on morale cannot be ascertained. However, it is clear from the responses that this was a point of concern amongst personnel assigned to the 6th Precinct.

**Recurring Themes Not Supported by the Facts**

The following recurring themes about the environment of the 6th Precinct were identified but determined to be unsupported by the facts:

- Management denied training requests of officers based on race;

---

[6] It should be noted that improvements to the facility had been planned and were pending prior to the February incident involving the traffic stop of the black female motorist by Corporal Steele and Officer Garrison.

- Management selected white officers to send to training more often than black officers;

- There were demeaning or derogatory comments written inside the precincts;

- Preferential treatment was given to white officers over black officers;

- Members were retaliated against for speaking out about their concerns;

- Certain people do not want to work with officers of other races;

- Officers on Platoon Three do not speak with the officers from other platoons; and

- People of color are very uncomfortable on Platoon Three.

## TRAINING DENIALS BASED ON RACE

This was one of the most significant perceptual trends within the precinct and appeared to be a source of great consternation amongst certain members. Efforts were, therefore, made to explore this issue more deeply.

After considerable review, it was determined that there were training denials of both white and black officers at approximately the same rate. Where there were denials, the order denying the request appeared to be supported by some objective basis, including prerequisite qualifications, staffing concerns, cancellations, or untimely submission of the requests. One member indicated that he had filed an Equal Employment Opportunity (EEO) complaint against a command officer for, amongst other issues, lack of training opportunities for black officers. It was discovered, however, that the EEO complaint did not include the training denial as an issue. In fact, of all the materials reviewed, no training request appeared to be denied based on race.

Despite the fact that no training request could be identified as being denied based on race, there was a concerning sentiment that training requests were being denied based on race. The root of this sentiment appeared to be a communication breakdown between command personnel and rank and file members of the 6th Precinct. There is no question that training requests were being denied; however, the reasons for the denials did not appear to have been conveyed to the member. It appears that the uncertainty further exacerbated feelings of racial animus in situations where training was denied. Ultimately, the assertions of a pattern or practice of denying training based on race were not substantiated.

## VIEWS OF MANAGEMENT

During the interviews, of precinct personnel, three commanding officers were identified as having contributed to the racial undertones at the precinct. The quantity of negative views could

Environmental                                                                      **Sixth Precinct**
Audit

be quantified by the member's exposure to command staff based on time at the precinct or the number of interactions. However, the magnitude of the comments were carefully examined to determine if there were serious negative perceptions attached to the command staff from the rank and file. Despite information provided by members, it was determined that the allegations were not supported by the facts.

The following represent trends of negative perceptions attached to specific commanding officers:

### Captain A

- Denied training to black officers.

- Displayed bias based on race and gender.

- Allowed white officers to obtain more training than black officers.

- Was not a leader.

- Had a "nasty" attitude.

- Denied a lot of training.

- A training request was approved only after a black supervisor put a white supervisor's name on the request.

- Had below average leadership abilities.

- Positive Administrative Counseling Reports were not given to blacks.

### Captain B

- Denied training because of race.

- Gave preferential treatment to officers on Platoon Three.

- Was not a good leader.

- Did not attend roll call.

- Was unable to make a decision.

- Interacted very little with members.

- Members could not talk to him.

15

**Environmental
Audit**                                                                    **Sixth Precinct**

*Captain C*

- Should be transferred to another command.

- Had below average leadership abilities.

- Showed biases.

- Showed favor toward white officers.

With respect to Captain C, one member alleged that he, "Don't like blacks, and damn sure do not like black women." Another member stated an officer had stated in the direct presence of Captain C, "We are about to go lock up some 'N***ers' and 'A-rabs'" to which the captain laughed it off.[7] When confronted by the member, the captain stated he didn't hear the comment, then went on to say the officers were just joking.

In a separate incident, Captain C was responsible for reviewing a Use of Force report prepared by Officer Garrison following a situation where there was a clear display of excessive force used against an elderly female and where the officer struck a man around the head and neck area while handcuffed in the backseat of his squad car. Captain C deemed this action acceptable as a "Category 3" use of force. In another incident, during a locker audit, Captain C provided a white officer advanced notice before cutting off locks from lockers and taking property away.

## CONCLUSIONS

Despite the fact that some of the concerns raised by members remained unsupported by the weight of the evidence, the audit brought to light the attitudes and perceptions of members about the leadership, supervision, and culture of the 6th Precinct. Specifically, the findings suggest the command officers may have known, or at least should have known, about the racially insensitive behavior, which was referred to during the audit as the precinct's "dirty little secret." There was evidence of a lack of responsiveness on the part of the 6th Precinct command officers. For example, there was a clear lack of diversity on Platoon Three. Despite this, the command officers failed to institute any sort of plan to address this.

The report revealed a common view held by many rank-and-file members that Corporal Steele and Officer Garrison engaged in racist acts. Like the lack of diversity on Platoon Three, the command officers did not institute corrective action plans to address this issue. The recurring themes established during the audit revealed evidence that the conduct was at least tolerated and accepted.

---

[7] The member providing this information was a retired member of the Detroit Police Department. Following commencement of the environmental audit, the member contacted the Detroit Police Department and requested to be interviewed. Subsequent inquiry resulted in a determination that the use of the term "ni***r" could not be substantiated because no other member stated that they had heard it. In spite of this, this report by a now-retired member of the Department adds to the concern that some members of the 6th Precinct may have legitimately perceived a racial undertone within the 6th Precinct's environment regardless of whether racial animus existed in fact.

The audit also provided some information regarding the members' perceptions of the command staff. Some members expressed race-based concerns regarding command officers at the 6th Precinct. In general, the concerns were based on perceived differences in the commanding officers' handling of training requests. The audit did not, however, prove that training denials were based on the race of the requesting member. What was revealed, in some instances, was that management did not provide an explanation for their denials. Consequently, members felt the denial was based on their race. It can be said that the racial undertones present in the environment coupled with the inaction of command officers to address the concerns of racial divide amongst officers helped shape these views about management. Although not entirely established by the audit, there is evidence that certain supervisory and non-supervisory members had become "tone-deaf" to racial concerns or animus. There is no evidence that such a situation exists beyond the 6th Precinct at this time.

Other environmental concerns likely contributed to this situation. The physical condition of the 6th Precinct was indicated as one of the reasons for the low morale of officers. When the 8th Precinct moved into a new facility in July 2017, members remaining at the 6th Precinct appeared to develop a feeling of being left behind, forced to operate in a dilapidated facility.

The audit revealed two additional concerns for which formal investigations were initiated. These concerns were forwarded to the Professional Standards Bureau for investigation.

In conclusion, this audit has revealed the following trends or recurring perceptions:

1. The racially charged incident involving Corporal Gary Steele and Police Officer Michael Garrison has focused wide-spread attention on the Detroit Police Department;

2. There is conclusive evidence that at least some members assigned to the 6th Precinct demonstrated racial animus or at least racial insensitivity when dealing with black citizens;

3. At a minimum, there is a strong sense of racial animus at the precinct; and

4. The audit findings suggest a culture of racial insensitivity amongst members assigned to the 6th Precinct.

## RECOMMENDATIONS / CORRECTIVE ACTION STRATEGIES

This report sets forth a number of recommendations that will be described more fully below. One order, however, shall be set forth in clear and undeniable terms. All members of the Department shall be responsible for promoting an environment that promotes a guardian mentality that comprehends all walks of life. Furthermore, no member shall be permitted to engage in behavior that is demeaning toward anyone's race, gender, sexual orientation, or other form of identity. The attempt by any member to attribute such behavior to "locker room banter," "shop talk," or

other purported settings or occasions shall be viewed by the Department as an admission to the underlying offense.

Based on the findings contained in the environmental audit, the following shall be implemented by the Department:

a.   *Department Wide Training in Cultural Sensitivity and Implicit Bias*

The Department acknowledges that many of the issues uncovered during the audit of the 6th Precinct existed beneath the day-to-day "surface conditions" of the environment. Constant and diligent inspection by command staff will, therefore, be critical in ferreting out feelings of ill will or racial animus within all of the Department's various command. As an initial step, however, the Department will require all members to attend training in cultural sensitivity and implicit bias. The training will be programmed into each members annual training. The failure by any member to attend this training will result in the suspension of the member's police powers and will subject the member to disciplinary action.

b.   *Enhanced Performance Reviews for Management*

The Department will be adopting an enhanced battery of performance evaluation reviews for its frontline and command-level managers. Under this enhanced system of evaluating managers, the Department will evaluate each manager's awareness of the command's racial makeup and any issues pertaining to racial or other forms of conflict amongst personnel. All managers shall be aware of racial or other forms of conflict within their commands and shall take appropriate managerial action should evidence of such conflicts surface. Managers that fail in this respect will be subject to disciplinary action and / or demotion.

c.   *Community Dialogue and Formal Debriefings for the 6th Precinct*

The Department will engage the community by scheduling panel discussions for members of the community and precinct personnel to attend. The Department will schedule at least three such panel discussions at various times (including nights and weekends) so that everyone will have an opportunity to participate.

Additionally, the 6th Precinct will undergo a formal debriefing on the results of the environmental audit. Members that attend the debriefing will be permitted ask questions about the audit and the findings. Personnel will also be given an opportunity to offer feedback relative to the audit methodology.

d.   *Training for 6th Precinct Personnel*

All current and formerly assigned 6th Precinct personnel should be provided with training that covers racial and cultural awareness, prejudicial behavior, and implicit bias to increase their knowledge of the attitudes and expressions that negatively impacts an individual because of their race, gender, or belonging to a specific group. Transferred members should be identified to attend this training to address concerns that racially insensitive ideologies and behaviors are transplanted by members being assigned to a new command. Training should be ongoing and in addition to each members required annual training. Furthermore, each member of the 6th Precinct should receive and acknowledge acceptance of the Department's Code of Conduct Manual Directive.

Finally, the Department should identify each member trained by Corporal Steele and require that every such member receive additional training in customer service, implicit bias, and constitutional policing due to their exposure to Corporal Steele's influence on their field training experience.

### e.   *Better Communication from Front Line Supervision*

Overall, the audit identified indifference on the part of supervision to address the concerns raised by members about the discourse between officers that had racial implications. The audit revealed a lack of diversity on Platoon Three with respect to race and gender. Supervisors must be attentive to these issues and respond appropriately. Supervisors should act to dispel rumors of racial tensions within the environment. Moreover, supervisors should remain observant of cliques forming within the precinct to avoid certain members being ostracized based on race and gender. One method to combat the development of cliques may be to rotate officers (particularly newer officers) when making scout car and / or shift assignments to help increase exposure to working with officers with different backgrounds and gender.

Supervision should promote effective communication with members about issues concerning race. Open and honest dialogue should allow members to freely express their perceptions and feelings regarding issues of race and general differences of individuals. Supervisors should identify methods of developing each member's outlooks about the community to ensure that they do not become desensitized to racially charged behavior and prevent racial micro aggressions from surfacing while interacting with citizens. The goal is to have proactive conversations to curtail negative behaviors from occurring and / or escalating.

Furthermore, supervisors should conduct daily reviews of body worn camera video for all field deployed personnel, particularly where there are clear performance indicators suggesting that enhanced monitoring would be appropriate. Any observed instances of discourteous, insensitive, or disrespectful treatment of individuals by officers should be addressed immediately and, where appropriate, with disciplinary action. The usage of "shop talk" between members shall not be an acceptable reason for using terminology that generalizes a specific group of people, which are labeled in a discriminatory manner.

Regardless of the type of corrective action, it is imperative that supervisors document their observations of members using offensive language, expressions, or where members engage in conduct that targets individuals based on their race. Corrective action should be progressive and aimed at correcting the behavior to prevent further occurrence of the inappropriate activity. Finally, supervisors should remain alert of conduct that does not improve after correction or training.

Supervisors must be reminded of the department's commitment and process of proactively identify and address problematic behavior. The Department's policy on its Management Awareness System should be reiterated and command officers must ensure that supervisors review the requirements of Performance Evaluation and Enhancement Review Sessions (PEERS). Information obtained through PEERS can be generated by a supervisor at any time to review work performance issues. Supervisors must proactively monitor the performance indicators of its members and not wait for the Department's Management Awareness System to generate a warning.

Finally, supervisors must be expected and required to communicate the Department's mission statement and vision, emphasizing the performance expectations and potential repercussions that could result from conduct that is contrary to the policies, procedures, and practices of the Department.

## f. *Command Officers and Senior Management*

Command officers and senior managers must reemphasize the mission and vision of the department as it relates to respecting the various differences in the community that is served by members of the 6th Precinct. This can be done at roll calls or in-service training held at the precinct. Command officers and senior management must provide members with the Chief's commitment of respect for the community, and the performance expectations of all members of the Detroit Police Department. Finally, command officers should meet with first line supervisors to discuss the morale and environment of the 6th Precinct as a result of the events described in this audit, particular the behavior of Corporal Steele and Officer Garrison.

## g. *Human Resources Personnel*

The demographics of the 6th Precinct should be examined to strive for gender and racial balance when assigning or transferring personnel.

## h. *Fleet*

Based on the interviews, members indicated the precinct could benefit from having additional vehicles assigned to the precinct.[8]

*i.*   ***Professional Education and Training***

Annual training should include curriculum that covers cultural inclusiveness, implicit bias, and the mandates of the federal Equal Employment Opportunity policy. Cultural diversity training should focus on increasing members' understanding of the characteristics and norms formed by the various communities serviced by the Detroit Police Department. The training should seek to ensure more positive outcomes in the day to day encounters with citizens and in the interactions with colleagues from different backgrounds.

*j.*   ***Resource Management***

Construction has already begun at the 6th Precinct. Moreover, the trailer facility that has been used to serve as a base of operations for the precinct's special operations section has been found to be inconsistent with an all-inclusive work environment. At the time of this report, the trailer facility was in the process of being dismantled. It is believe that these improvements will help increase morale.

**FIGURE 1**

---

[8] The 6th Precinct was included in the Department's four-year vehicle replacement plan. The 6th Precinct has at the time of this report already seen replacement vehicles and can expect more newer-model vehicles in 2019 and 2020.

**Environmental Audit**                                                          **Sixth Precinct**





## FIGURE 2

**Sixth Precinct Demographics**

Sixth Precinct personnel by race and gender as of February 5, 2019.

| SIXTH PRECINCT PERSONNEL BY RACE AND GENDER | | | | | | |
|---|---|---|---|---|---|---|
| Rank | BLACK MALE | WHITE MALE | HISPANIC MALE | BLACK FEMALE | WHITE FEMALE | TOTALS |
| Commander | 1 | | | | | 1 |
| Captain | | 1 | | | | 1 |
| Lieutenant | 2 | 3 | | | | 5 |
| Sergeant | 6 | 2 | 1 | | | 9 |
| Master Sergeant | 2 | 2 | | | | 4 |
| Detective | 2 | 2 | | 2 | | 6 |
| Corporal | 3 | 1 | | 1 | | 5 |
| Police Officer | 23 | 40 | 8 | 15 | 7 | 93 |
| Neighborhood Police Officer | 2 | | | 1 | 2 | 5 |
| Executive  Secretary | | | | 1 | | 1 |
| Office Management Assistant | | | | 5 | | 5 |
| TOTALS | 41 | 51 | 9 | 25 | 9 | 135 |

Sixth Precinct duty assignments by race and gender as of February 5, 2019.

| SIXTH PRECINCT PERSONNEL RACE AND GENDER BY PLATOON | | | | | | |
|---|---|---|---|---|---|---|
| ASSIGNMENT | BLACK MALE | WHITE MALE | BLACK FEMALE | WHITE FEMALE | HISPANIC MALE | TOTALS |
| ADMINISTRATION STAFF | 6 | 1 | 6 | 2 | | 15 |
| PLATOON 1 | 6 | 9 | 6 | 5 | 1 | 27 |
| PLATOON 2 | 12 | 9 | 8 | 1 | 2 | 32 |
| PLATOON 3 | 4 | 16 | 3 | | 2 | 25 |
| PLATOON 4 | 10 | 10 | | | 3 | 23 |
| PRECINCT DETECTIVE UNIT | 2 | 6 | 3 | 1 | 1 | 13 |
| TOTALS | 40 | 51 | 26 | 9 | 9 | 135 |

# EXHIBIT 2



MISSION STATEMENT

The Detroit Police Department is a model of sustained policing excellence that places our neighborhoods and people first.

James E. Craig
Chief of Police

# ENVIRONMENTAL

# AUDIT

6th Precinct

# Contents

**INTRODUCTION** ..........................................................................................................................1

**SUMMARY OF FINDINGS** ..........................................................................................................3

**I.        CIVIL RIGHTS DIVISION** .................................................................................................3

    *Scope* ..........................................................................................................................................3

    *Methodology* ..............................................................................................................................3

    *Detailed Findings*.......................................................................................................................17

    *Conclusion and Insight* .............................................................................................................17

**II.       CIVIL RIGHTS BODY WORN CAMERA** ............................................................................19

    *Scope of Review – Gary Steele* .................................................................................................19

    *Methodology* ............................................................................................................................19

    *Detailed Findings*.......................................................................................................................25

    *Conclusion and Insight* .............................................................................................................25

    *Scope of Review –Michael Garrison* ........................................................................................27

    *Methodology* ............................................................................................................................27

    *Detailed Findings*.......................................................................................................................42

    *Conclusion and Insight* .............................................................................................................43

    *Scope of Review – Control Officer H*.........................................................................................44

    *Methodology* ............................................................................................................................44

    *Detailed Findings*.......................................................................................................................46

    *Conclusion and Insight* .............................................................................................................47

**III.      HUMAN RESOURCES** ....................................................................................................48

    *Scope* ........................................................................................................................................48

    *Methodology* ............................................................................................................................48

    *Diversity and Equal Employment Opportunity (EEO)* ..............................................................49

    *Attendance* ...............................................................................................................................51

    *Detailed Findings*.......................................................................................................................51

    *Conclusion and Insight* .............................................................................................................53

**IV.      PROFESSIONAL EDUCATION & TRAINING**....................................................................54

    *Scope* ........................................................................................................................................54

    *Methodology* ............................................................................................................................54

    *Detailed Findings*.......................................................................................................................54

    *Conclusion and Insight* .............................................................................................................54

V.      RESOURCE MANAGEMENT ................................................................................55
    *Scope* ...............................................................................................................55
    *Methodology* ....................................................................................................55
    *Detailed Findings* ..............................................................................................55
    *Conclusion and Insight* ......................................................................................55
VI.     FLEET MANAGEMENT ....................................................................................56
    *Scope* ...............................................................................................................56
    *Methodology* ....................................................................................................56
    *Vehicles / Cycles at the Garage for Repair* ........................................................56
    *Detailed Findings* ..............................................................................................56
    *Conclusion and Insight* ......................................................................................57
VII.    RISK MANAGEMENT .......................................................................................58
    *Scope* ...............................................................................................................58
    *Methodology* ....................................................................................................58
    *Detailed Findings* ..............................................................................................58
    *Performance Evaluation Ratings* ........................................................................58
    *Daily Observation Report (DOR) and Monthly Evaluation Report (MER)* ..............59
        Police Officer Jeremy Parinello, Badge 4890 ..................................................59
        Police Officer Ibrahim Kakish, Badge 854 .......................................................60
        Police Officer Gary Steele, Badge 4279...........................................................63
        Police Officer Michael Garrison, Badge 4185 ..................................................64
    *PEER Group of Officers* ......................................................................................66
        Police Officer Gary Steele ..............................................................................66
        Police Officer Michael Garrison ......................................................................66
    *Allegations of Misconduct / Disciplinary Actions / Civil Litigation* .......................67
        Police Officer Gary Steele ..............................................................................67
        Police Officer Michael Garrison ......................................................................68
    *Conclusion and Insight* ......................................................................................69
        Supervisory Evaluations and Responses .........................................................69
        Citizen Complaint Data ..................................................................................70
    *Misconduct and Civil Litigation Activity* .............................................................70
        Police Officer Gary Steele ..............................................................................70
        Police Officer Michael Garrison ......................................................................70

*Recommendations* ............................................................................................................................... 71

Training for Sixth Precinct Personnel................................................................................................... 71

First Line Supervisors ......................................................................................................................... 71

Command Officers and Senior Management ...................................................................................... 72

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

# INTRODUCTION

The Detroit Police Department (Department) is the largest law enforcement agency in the state of Michigan and one of the largest in the United States. Multiple commands make up the Department, each with their own unique set of responsibilities outlined in Standard Operating Procedures (SOP).

Internal Environmental Audits are conducted at the direction of Chief of Police James E. Craig to increase awareness regarding morale, identify positive trends that might serve as examples to other commands, and to troubleshoot deficiencies so they might be resolved most expeditiously. To ensure continuity in how they are performed, auditors are directed to focus on the following categories, some of which overlap:

**Environment**

**Accountability**

**Civil Rights**

**Morale**

Auditors assess a broad range of issues when examining the environmental component. These include, but may not be limited to the inspection of facilities, vehicles, equipment, and work space to determine whether the work environment is conducive to good work productivity.

Additionally, the accountability component consists of an examination of "systems" that are in place within the organization that have a positive or negative effect on personnel meeting Department expectations. This component focuses on management and its ability to inspire employees to work up to their potential.

Chief Craig's commitment to community policing and recognizing the civil rights of our citizenry is a priority. Accordingly, monitoring performance and compliance with Department policies are of the utmost importance when performing any audit.

Finally, employees are the most treasured asset of the Detroit Police Department; Chief Craig firmly believes that a lack of morale is a reflection of leadership (or lack thereof). Consequently, the primary objectives of this portion of the audit are to determine whether patterns exist involving positive experiences that should be duplicated elsewhere, and/or whether complaints exist that can potentially have an adverse effect on the organization which must be addressed immediately. In order to assist auditors in capturing the "spirit" of the rank and file, they are tasked with randomly sampling both sworn and civilian employees and conducting one-on-one interviews at the given command (when available). Auditors are directed to ensure both male

1

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

and female members of different ranks, seniority, and race/ethnicity have an opportunity to participate in the process.

Command Officers can expect the information gathered during Environmental Audits to be discussed at the discretion of the Chief of Police. The purpose is not to cause embarrassment, but rather to enable management to learn from each other. Note, this process is fluid and subject to change based on Department needs; however, Command Officers will be privy to modifications and expectations.

## METHODOLOGY
The following commands within the Detroit Police Department worked cooperatively to perform an Environmental Audit of the Sixth Precinct:

**Civil Rights Division**
- *Morale – Spirit of rank and file*
- *Attendance Audit – Sick Time Comparison*
- *Body Worn Camera – Audio/Video Review*

**Risk Management/Professional Standards Bureau**
- *Familiarity with the Department's Management Awareness System*
- *Daily Observation Reports*
- *PEER reviews*
- *Misconduct Records*
- *Civil Litigation History*

**Human Resources (HR)**
- *Attendance, Staffing, and Equal Employment Opportunities*

**Professional Education and Training**
- *Field and In-Service Training*
- *Firearms Inventory – Ordnance Audit*

**Resource Management**
- *Interior/Exterior Site Inspections*

**Fleet Management**
- *Inspection of Police Vehicles*

Each of the aforementioned commands conducted separate independent audits, unique to their expertise; all of which are summarized in the summary of findings. For example, members of the Civil Rights Division (CRD) conducted one-on-one interviews of members assigned to the Sixth Precinct. The objective of this audit was to gauge the pulse of personnel in association with morale.

2

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

# SUMMARY OF FINDINGS

## CIVIL RIGHTS DIVISION
**Morale and Spirit of the Rank and File**

*Scope*

The Civil Rights Division (CRD) – Audit Team conducted interviews to capture the culture, working conditions and the reflections of members regarding the effectiveness of the supervision and management of the Sixth Precinct.

Interviews were conducted with 88 members during the period from February 4, 2019, through February 14, 2019.  Interviews were not conducted on each day in the period.



Assertions by members of the Sixth Precinct were that the environment at the precinct was racially divided amongst officers, and citizens were mistreated because of their race; and at times, because of gender.  Specifically, the behavior of Police Officer Gary Steele, Badge 4279, who was then a Corporal, and Police Officer Michael Garrison, Badge 4185, contributed to the racial undertones of the precinct and may have passed on to other officers conduct that was insensitive and discourteous toward citizens based on their race.

Officer Steele was appointed to the department on August 31, 2000 and was assigned to the Sixth Precinct [Northwestern District] on February 12, 2007.  A review of use of force data since his appointment date yielded the following results:

Officer Steele has sixteen reported uses of force in MAS and his first use of force occurred in 2011. The yearly breakout of these uses of force is:  three incidents in 2011, one incident in 2013, one incident in 2015, four incidents in 2016; five incidents in 2018, and one incident involving two uses of force in January 2019.  The race and gender of the individuals who Officer Steele used force against were nine black males, four black females, and two white males.

Officer Garrison was appointed to the department on July 31, 2000 and was assigned to the Sixth Precinct on January 8, 2001.  A review of use of force data since his appointment date yielded the following results:

Officer Garrison has thirteen reported uses of force in MAS and his first use of force occurred in 2011.  The yearly breakout of these uses of force is:  two incidents in 2011; one incident in 2013; one incident in 2014; two incidents in 2015; four incidents in 2016; one incident in 2018; and one incident involving two uses of force in January 2019.  The race and gender of the individuals who Officer Garrison used force against were ten black males, one black female, and one white male.

*Methodology*

During the interviews, each member was asked 30 questions.  They were also able to freely and openly talk about any command issues they wanted to discuss.  The interviews were conducted

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

of supervisors, police officers, non-sworn personnel, and retirees. A combined total of 88[1] members were interviewed. The seniority of the members ranged from 1.5 to 34 years of service.

The race of the interviewed members were 38 (43%) black males, 33 (38%) white males, 8 (9%) black females, 3 (4%) Hispanic males, 3 (3%) Middle Eastern males, 2 (2%) white females and 1 (1%) biracial female.

The breakdown of members assigned from the Police Academy and those transferred to the Sixth Precinct who were interviewed is shown below:

- 59 of 88 (67%) members were assigned to the precinct

- 29 of 88 (33%) members were transferred to the precinct

  - 20 of 29 (69%) members voluntarily transferred to the precinct

  - 9 of 29 (31%) members were involuntarily transferred to the precinct. The involuntary transfers were due to manpower issues.

The specific job assignments for the members who were interviewed are:

- 48 of 88 (55%) are assigned to patrol.

- 12 of 88 (14%) were supervisors. Of the 12, 10 were sergeants and 2 were lieutenants.

- 7 of 88 (8%) are assigned as Neighborhood Police Officers.

- 6 of 88 (7%) are assigned to the Precinct Detective Unit.

- 5 of 88 (6%) are Administrative Assistants.

- 4 of 88 (5%) are assigned out to other commands (1 Sergeant, 2 Police Officers and 1 Civilian).

- 3 of 88 (3%) are assigned to Station Security.

- 3 of 88 (3%) are civilian (Desk Operations Support Officer).

The platoon assignments for those members who were interviewed are:

---

[1] The data represented for the 88 members, reflects precinct personnel who were available and chose to participate with the interviews. Some members were unavailable on the dates the interviews were conducted due to reasons such as furlough, extended sick, suspension, etc. Although, the data reflects a subset of the Sixth Precinct population, the information obtained from the sample data revealed the environment at the Sixth Precinct.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

- 13 of 88 (15%) are assigned to Platoon 1.

- 29 of 88 (33%) are assigned to Platoon 2.

- 22 of 88 (25%) are assigned to Platoon 3.

- 14 of 88 (16%) are assigned to Platoon 4.

- 10 of 88 (11%) are assigned to other assignments (including PDU and assigned out).

<mark>Below are the interview questions and summarized responses for the members who were interviewed:</mark>

**Q.** **The members were asked if they knew their span of control supervisor.**

- 82 of 88 members (93%) knew their span of control supervisor.

- 3 of 88 members (3%) were unsure of their span of control supervisor.

- 3 of 88 members (3%) were not asked this question because they are assigned out.

**Q.** **The members were asked about interactions with their span of control supervisor.**

- 82 of 88 members (93%) interact with their span of control supervisor daily.

- 3 of 88 members (3%) were unsure if they interact with their span of control supervisor.

- 3 of 88 members (3%) were not asked this question because they are assigned out.

**Q.** **The members were asked if they knew their captain and commander**

- 71 of 88 members (81%) knew their captain and commander.

- 4 of 88 members (5%) did not know either the captain or commander.

- 10 of 88 members (11%) knew just the commander.

- 1 of 88 members (1%) knew just the captain.

- It should be noted that responses were not obtained from two members.

5

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

Q.     **The members were asked if they knew the captain and commander had an open door policy.**

- 70 of 88 members (79%) knew the captain and commander have an open door policy.

- 12 of 88 members (14%) knew the commander had an open door policy.

- 6 of 88 members (7%) did not know if either the commander or captain had an open door policy.

Q.     **The members were asked whether they recalled receiving their performance evaluations.**

- 24 of 88 members (27%) recalled receiving performance evaluations in 2019.

- 50 of 88 members (57%) recalled receiving performance evaluations in 2018.

- 2 of 88 members (2%) recalled receiving performance evaluations in 2017.

- 8 of 88 members (9%) could not recall when they received their last performance evaluation.

- 1 of 88 members (1%) recalled they did not receive a performance evaluation.

- 3 of 88 members (4%) were not asked this question because they were assigned out.

Q.     **The members were asked what they liked <u>MOST</u> about their command.  Some of the responses were:**

- The Officers in Charge and commanding officers are great to work with.

- Unique Identifier G checked on how we were feeling after responding to a scene where a three-year old child was shot.

- Camaraderie of the officers, it's like home, a family atmosphere.

- Great people to work with, professional group of people.

- The diversity, multiple ethnic groups, and interpersonal relationships.

6

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

- Populated area, keeps me busy, high call volume.

- Unique Identifier H is very approachable, he makes roll call.

- Supervisors are nice, approachable and knowledgeable.

- The precinct is close to home.

- The community is diverse, which makes you learn.  Eastern end border is Dearborn which is an Arabic and Muslim community and you have to learn and understand their culture when speaking to them.

- Neighborhood and the community.

Q.   The members were asked what they like LEAST about their command.  Some of the responses were:

- People pretend it's not a racial issue, like a family's "dark secret."

- We act like racial discrimination issues do not exist. There has always been a racial problem at this precinct.

- Sworn members can be offensive in their language and with open discussions on certain topics while talking to other sworn members (e.g., sexist/sexual, political, racist topics).

- There are not enough women working here, we need them for female searches.

- This job is all about egos, 'I'm smarter then you are, and better.'  It's all about competition.

- The overall structure of the building: water damage, rodent problem, filthy locker room, broken garage door, birds inside garage, bad ventilation, metal detector is insufficient, broken chairs, slug imprint remains at front desk from shootout.

- The video outside is not working, poor lighting outside, front window needs repair.

- Short notice on upcoming training, more time needed to request training.

- Members shouldn't have to request training; it should be provided automatically.

7

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

- Parking in the same lot as the citizens.

- Not enough scout cars.

- Manpower needs in the Precinct Detective Unit.

- Not enough manpower and supervisors.

- Denial of compensatory time.

Q.    **The members were asked what they would change - if they had the ability to change anything at the Sixth Precinct. Some of the responses were:**

- Stop favoritism, stop preferential treatment.

- Shift hours.

- Overhaul of the building.

- Better security in the building.

- Additional manpower.

- Additional scout cars.

Q.    **The members were asked about the social culture at the Sixth Precinct and if they had concerns related to security and race.  Some of the responses were:**

- One member had some security concerns about the precinct.  He indicated that he requested back-up and did not get any. He felt it was based on his race.

- [Social culture] not very good, there are cliques.

- No balance between black and white officers.

- Garrison and Steele did not hang out with other officers on Platoon 3 and Platoon 4, possibly because they are older.

- An officer from Platoon 3 stated [the social culture] was not very good, there is a big age gap between officers and hard to relate.

- The member of a platoon do not socialize with members of other platoons.

8

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

- A few bad apples in the bunch, we have a couple of people who do not like each other because of the color of their skin, the two people were suspended, the command knew that about race, however, never addressed it.

- People of color are very uncomfortable on Platoon 3.

- We are like family.

- The Administration is great, afternoons and midnights do not talk to each other.

**Q.**   **The members were asked if they thought the command makes good use of its resources. Some of the responses were:**

- Yes they do, for the most part.

- Upper administration focuses on the downtown area and does not assign required numbers for manpower to the precinct.

**Q.**   **The members were asked to describe the work relationship between DPD members on their platoon/shift.  Some of the responses were:**

- The work relationship was not so good.

- The platoons do not interact with each other and members keep to themselves.

- The members of Platoon 3 did not socialize with members from other platoons and made it very uncomfortable for individuals of certain race and gender to work on Platoon 3.

**Q.**   **The members were asked if they received training on racial discrimination and hostile work environment.**

- The members provided various responses to this question.  However, the members who responded "Yes", the training was received during the 40 hour block training.

**Q.**   **The members were asked if they were left out of certain training because of race.**

- 82 of 88 members (93%) stated they were not left out of training because of race.

- 6 of 88 members (7%) stated they were left out of training because of race.

9

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

> One member stated he was "...denied training between the years of 1998 and 2000," further, "the department only sent white officers." Some members stated that Unique Identifier C denies training due to race. Other members stated that Unique Identifier I allowed white officers to obtain more training than black officers.

**Q.    The members were asked if a DPD member had ever directed any retaliatory tactics towards them or other officers.**

- 77 of 88 members (88%) had not experienced or observed retaliatory tactics.

- 11 of 88 members (13%) had experienced or observed retaliatory tactics.

- Some of the comments from these members were:

  > It is black on black, white on white or *vice versa*, it's a matter of officers not doing what other officers want them to do. This member was not comfortable giving examples but reported seeing and hearing about [retaliatory tactics] recently.

  > One member stated that he had experienced retaliatory tactics on Platoon 3. This member was fearful and did not want to elaborate.

**Q.    The members were asked if they have witnessed unethical behavior by other DPD members.**

- 66 of 88 members (75%) have not witnessed unethical behavior by other members.

- 22 of 88 members (25%) have witnessed unethical behavior by other members.

- Some comments from members who'd witnessed unethical behavior were:

  > Members used to fight behind the garage, witnessed partner throw feces on another member.

  > A couple of members witnessed unethical behavior in relation to Platoon 3 but would not elaborate.

  > A member described an accident scene where the officer was making fun of a citizen.

  > A black corporal told a member that she would not train him because she only trains black PPOs.

10

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

➢ There is an undertone of dislike for citizens on Platoon 3 and it is not just based on race – some dislike is social economic status is another factor.

➢ An Arabic officer on Platoon 2 refuses to work Platoon 3 based on discriminatory remarks towards the officer.

➢ There were some issues involving Unique Identifier J, Unique Identifier K and issues with Unique Identifier I regarding training, but no additional information was provided.

Q.    **The members were asked if they have noticed preferential treatment for some DPD members. Some of the responses were:**

- Some people are treated better (differently) on the afternoon platoon.

- How you're treated is based on a person's race when one member is favored over another.

- Some officers received special training.

- One person gets an assignment because of friends and family that someone else wanted, PDU has always been all white, no blacks in PDU in 42 years.

- Some members receive preferential treatment over others.

- Only white FTOs train white PPOs and black FTOs train black officers (PPOs).

- More meritorious awards were given to white members, only one award was given to a black member.

Q.    **The members were asked if they have voiced any complaints or concerns to management.**

- Most members stated they have not voiced any complaints or concerns to management. In general, complaints and concerns were not communicated to management because the member would be considered a snitch or ostracized by other members.

- Some comments and impressions of those members who did voice complaints or concerns to management were:
  ➢ Some officers voiced concerns during a roll call with Unique Identifier L. The supervisor met with Unique Identifier L and confirmed everything the officers said. A concern was brought up about Unique Identifier I and Unique Identifier L

11

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

shrugged it off.   Unique Identifier L said he does not see any concerns about Unique Identifier I because he has a personal relationship with and has had dinner with him and his wife.

➢ Some complaints were about officers going too far when arresting citizens and mistreating other members (nothing specific was documented).

➢ Officers feel that they are not going to speak out any more about things because they are not being heard and nothing is going to change.

**Q.   The members were asked if they have ever requested a transfer and the request was denied.**

- Most members stated they had not had a transfer request denied.  When a member was denied a transfer, the following reasons were provided:

➢ Based on suitable replacement.

➢ No one allowed to leave the precinct due to an ongoing investigation.

➢ Lack of manpower.

➢ Unfavorable recommendation.

**Q.   The members were asked if they felt comfortable communicating and socializing with peers assigned to the same platoon.**

- Most members responded "Yes", they are comfortable communicating and socializing with their peers.  However, one member did not feel comfortable with their peers and another member did not feel comfortable socializing with peers outside of work.

**Q.   The members were asked if they thought the members treat citizens fairly.**

- 76 of 88 members (86%) feel the citizens are treated fairly.

- 8 of 88 members (9%) feel the citizens are not treated fairly.

- 4 of 88 members (5%) feel citizens are treated unfairly sometime.

**Q.   The members were asked how they think other members feel about the community.**

- Some members stated they loved the community, but would only speak for themselves.

12

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

- Other members provided the following generalizations about members' feelings regarding the community:

  ➢ Some members generally like the community.

  ➢ Some members treat the community like "shit."

  ➢ Some members have bad attitudes toward the citizens.

**Q.** **The members were asked if they discuss department/command issues during roll call.**

- 66 of 88 members (75%) discuss department/command issues during roll call.

- 11 of 88 members (13%) do not discuss department/command issues during roll call.

- 9 of 88 members (10%) do not attend roll call.

- 2 of 88 members (2%) were not asked because they were not at the command.

**Q.** **The members were asked how often they have meetings with command staff.**

- Most members indicated that there are no command staff meetings. However, the supervisors indicated that they do in fact have staff meetings regularly.

**Q.** **The members were asked if they discuss constitutional policing.**

- 61 of 88 members (75%) stated yes, constitutional policing is discussed at the precinct.

- 18 of 88 members (13%) stated no, constitutional policing is not discussed at the precinct.

- 7 of 88 members (10%) stated they do not attend roll call.

- 2 of 88 members (2%) were not asked because they were not at the command.

**Q.** **The members were asked if there were any matters that they would like to discuss.**

- Some comments from the members are detailed below:

13

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

➢ Unique Identifier G is a catalyst for negativity and should be removed (this comment was made by more than one member).

➢ An EEO investigation was filed against Unique Identifier I regarding denial of training to black officers.

➢ Some members expressed concerns about Officer Gary Steele and Officer Michael Garrison. The members stated that firing them would establish a policy on racial discrimination and the zero tolerance policy.

➢ Several members assigned to the Sixth Precinct should be reassigned to different commands, i.e., Unique Identifier G, Unique Identifier M, Unique Identifier N and Unique Identifier P, Officer Gary Steele, Officer Michael Garrison

➢ Officer Steele and Officer Garrison told officers not to back up Platoon 4 officers.

➢ There is a divide between black and white officers.

➢ Officer Gary Steele was not training new officers properly.

After February 21, 2019, the team conducted interviews of 49 members for follow-up information. Of those interviewed, 20 members (41%) were black males, 17 members (35%) were white males, 8 members (16%) were black females, 3 members (6%) were Hispanic males, and 1 member (2%) was a white female. The responses received from the members are detailed below.

Q.   **The members were asked if they were advised not to provide back up to another member.**

• 46 of 49 members (94%) were not advised to not back up another member.

• 3 of 49 members (6%) were advised to not back up another member.

• Some of the comments about not backing up other members were:

➢ Garrison and Steele told members not to back up the 30 series.

➢ Some members have heard of this but did not experience it.

➢ Steele does not want to back up anyone and does not want anyone to back him up.

14

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

**Q.** **The members were asked if there are <mark>racial overtones</mark> within the Sixth Precinct.**

- 30 of 49 members (61%) answered "No."

- 2 of 49 members (4%) did not feel comfortable answering this question.

- 17 of 49 members (35%) answered "Yes."

- The members who responded "Yes" provided the following comments:

  ➢ Unique Identifier G is a catalyst for negative and should be removed (more than one member made this comment).

  ➢ <mark>With Gary Steele, members do not want to work Platoon 3.</mark>

  ➢ <mark>Two officers will not work Platoon 3 because of Garrison and Steele.</mark>

  ➢ Black officers speak to white officers and the white officers do not respond.

  ➢ Unique Identifier P called an Arabic officer a terrorist.

  ➢ <mark>Officer Steele calls black people "cousins."</mark>

  ➢ Heard Unique Identifier Q is disrespectful towards citizens.

**Q.** **The members were asked if minorities received disparate treatment at the Sixth Precinct.**

- 36 of 49 members (74%) answered "No."

- 2 of 49 members (4%) were unsure about disparate treatment of minorities at the Sixth Precinct.

- 11 of 49 members (22%) answered "Yes."

- The members who responded "Yes" provided the following comments:

  ➢ <mark>Officer Steele and Officer Garrison control what happens on Platoon 3.</mark>

  ➢ Training favoritism.

  ➢ A supervisor was overheard making jokes to a Middle Eastern officer.

15

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

**Q.** **The members were asked if officers at the Sixth Precinct conducted <mark>traffic stops to avoid police runs.</mark>**

- 28 of 49 members (57%) answered "No."

- 4 of 49 members (8%) did not know whether traffic stops were conducted to avoid police runs because they are not assigned to the street.

- 17 of 49 members (35%) answered "Yes."

- The members who responded "Yes" provided the following comments:

  ➢ <mark>Garrison and Steele make stops to avoid being held over.</mark>

  ➢ <mark>Officer Steele told me the best way to not get held over is not to do a police run but do traffic stops.</mark>

  ➢ <mark>Garrison and Steel are the "King of Tow."</mark>

**Q.** **The members were asked if they had witnessed members who were not supervised effectively.**

- 40 of 49 members (82%) answered "No."

- 9 of 49 members (18%) answered "Yes."

- The members who responded "Yes" provided the following comments:

  ➢ A white officer told a black supervisor that he would not do what was asked of him because he was not his immediate supervisor.

  ➢ Depends on supervisors' people skills and how they talk to people.

**Q.** **<mark>The members were asked if there was a divide among the members assigned to the Sixth Precinct.</mark>**

- 29 of 49 members (59%) answered "No."

- 20 of 49 members (41%) answered "Yes."

- The members who responded "Yes" provided the following comments:

  ➢ <mark>Divide between color and race.</mark>

16

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

➢ Certain people do not want to work with others White/Arab/Black.

➢ Racial divide.

➢ Age divide.

➢ Generation gap.

➢ Garrison and Steele feel they are above everyone on the department.

➢ People on Platoon 3 do not speak with the other platoon members.

➢ Platoon 3 is a huge clique.

*Detailed Findings*

The Auditors gave the members an opportunity to discuss anything openly and freely (30th question).  To summarize their comments it was noted on one or more occasions that Unique Identifier G is a catalyst for negativity and should be removed.  Currently there was one EEOC filed on Unique Identifier I in reference to denying training to black officers.  It is pertinent to note that the members did express some concerns about Police Officers Gary Steele and Michael Garrison, indicating that firing them would establish a policy on the racial discrimination as well as the zero tolerance policy.  Several members assigned to the Sixth Precinct should be re-assigned to different entities within the department (names mentioned were: Unique Identifier M, Unique Identifier G, Officer Gary Steele, Officer Michael Garrison, Unique Identifier N and Unique Identifier P.)

In addition, the following was stated by members that Officers Steele and Garrison were telling officers not to back up Platoon 4 officers.  There is a divide between black and white officers.  Officer Steele was not training new officers properly.

*Conclusion and Insight*

In summary the survey revealed that there is some racial tension within the Sixth Precinct, and there is higher tendencies on Platoon Three then the rest of the precinct.  However, our audit did not reveal any one member responsible for the tensions.  In fact this appeared to be going on for some time as previous command staff was named on some occasions, some more than others, (Unique Identifier M, Unique Identifier I, Unique Identifier C and Unique Identifier J).  Furthermore, there were comments made that Unique Identifier L was aware of these racial issues when he made a Sixth Precinct Roll Call and nothing was done about it.

It is the Civil Rights Bureau's recommendation that the Sixth Precinct, as well as the entire department receive mandatory discrimination training, including but limited to the Command Staff and that this training be incorporated with the mandatory 40 hour block.  Furthermore, it is Civil Rights Division recommendation that all members received sensitivity training as it relates

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

dealing with citizens to ensure all citizens regardless of their social status are treated fairly. In addition, it is CRD's recommendation that the Sixth Precinct's manpower be re-constructed to balance the shift.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

## CIVIL RIGHTS BODY WORN CAMERA
**WatchGuard Video System Audit (Audio / Video Review)**

*Scope of Review – Gary Steele*
The Civil Rights Body Worn Camera Team performed reviews of the WatchGuard Video System observing the data for the months of December 2018 and January 2019 in relation to the citizen contacts and towing activities of Police Officer Gary Steele, Badge 4279.

*Methodology*
On December 1, 2018, Officer Steele wearing body worn camera serial number WFC1-012601, working with Officer A, both assigned to the Sixth Precinct, conducted a traffic stop at 21:38 and investigated a black male. The officers initiated the traffic stop for speeding and failed to signal right turn. The officers categorized the event in the WatchGuard System as a Traffic Investigation.
**Disposition:** Issued an ordinance for speeding, and failed to signal, the vehicle was towed.

On December 3, 2018, Officer Steele wearing body worn camera serial number WFC1-028172, working with Officer B, both assigned to the Sixth Precinct, conducted a traffic stop at 18:52 and investigated a black male. The officers initiated the traffic stop for speeding. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle,
**Disposition:** Issued ordinance for no proof of insurance, speeding, and uninsured motor vehicle, the vehicle was towed. The black male also had warrants furthermore, an arrest was effected.

On December 4, 2018, Officer Steele wearing body worn camera serial number WFC1-041126, working with Officer B, both assigned to the Sixth Precinct, conducted a traffic stop at 23:06, and investigated a black male. The officers initiated the traffic stop for defective headlights. The officers categorized the event in the WatchGuard System as Unknown. The vehicle was not towed however, Officer Steele informed Officer B not to write the ordinance for uninsured motor vehicle, because he stated **"we are not towing it this late"** and to write it for no proof of insurance.
**Disposition:** Issued ordinance for no proof of insurance, and defective headlights.

On December 6, 2018, Officer Steele, wearing body worn camera serial number WFC1-041341, working with Officer Garrison, both assigned to the Sixth Precinct, conducted an investigation at 21:36, and investigated a black female and conveyed the female home. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle. However, referenced 5 minutes and 21 seconds into the video that **"I usually wait until about 10:30, to give them the walk of shame."**
**Disposition:** Courtesy conveyance home.

On December 6, 2018, Officer Steele, wearing body worn camera serial number WFC1-041341, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 22:10, and investigated a black female.

19

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

The officers initiated the traffic stop for expired plates and categorized the event in the WatchGuard System, as a Traffic Investigation. However, referenced 59 seconds into the video, "Think it's a Keisha."
**Disposition:** Issued ordinances for driving while licenses suspended, uninsured motor vehicle, and unregistered motor vehicle, the vehicle was towed. The black female also had warrants however, an arrest was not made.

On December 10, 2018, Officer Steele, wearing body worn camera serial number WFC1-033375, working with Officer B, both assigned to the Sixth Precinct responded to an accident scene at 20:34 and investigated a black female and black male regarding an off duty officer involved accident. The officers categorized the event in the WatchGuard System as a Traffic Investigation Accident.
**Disposition:** The off duty officer black male was listed at fault and the officer used their discretion not to arrest the black female for driving while license suspended and no insurance, two vehicles were towed.

On December 10, 2018, Officer Steele, wearing body worn camera serial number WFC1-033375, working with Officer B, both assigned to the Sixth Precinct conducted a traffic stop at 23:06, and investigated a black female. The officers initiated the traffic stop for expired plate. The officers categorized the event in the WatchGuard System as a Traffic Investigation.
**Disposition:** Issued ordinances for driving while license suspended, improper plates, and no insurance, the vehicle was towed.

On December 11, 2018, Officer Steele, wearing body worn camera serial number WFC1-028172, working with Officer Garrison, both assigned to the Sixth Precinct conducted, a traffic stop at 22:00, and investigated a black female. The officers initiated the traffic stop for obscured plate. The officers categorized the event in the WatchGuard System, as Investigate Person/Vehicle. However, 7 minutes and 52 seconds into the video Officer Steele asked, "Anyone in the car with her?", and Officer Garrison replied, "Another Keisha."
**Disposition:** Issued ordinances for uninsured motor vehicle and no valid driver's license, the vehicle was towed. The black female also had warrants however, an arrest was not made.

On December 14, 2018, Officer Steele, wearing body worn camera serial number WFC1-041633, working with Officer C, both assigned to the Sixth Precinct, conducted a traffic stop at 20:42 investigating a black male. The officers initiated the traffic stop for improper passing on a double line. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinance for driving while license suspended, and no operators permit, the vehicle was towed. The black male also had warrants however, an arrest was not made.

On December 15, 2018, Officer Steele wearing body worn camera serial number WFC1-014300, working with Officer D both assigned to the Sixth Precinct, conducted a traffic stop at 21:32, and investigated a black male. The officers initiated the traffic stop for failing to yield. The officers categorized the event in the WatchGuard System as Unknown.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

**Disposition:** Issued ordinances for driving while license suspended, no insurance, and improper plate the vehicle was towed. The black male also had warrants however, an arrest was not made.

On December 17, 2018, Officer Steele wearing body worn camera serial number WFC1-032388, working with Officer B, both assigned to the Sixth Precinct, responded to an accident scene at 21:29, and investigated a black female. The officers initiated the traffic stop for an accident. The officers categorized the event in the WatchGuard System as Unknown, and investigated a black female.
**Disposition:** Vehicle was towed.
In addition, at 22:00 while holding the accident scene the officer initiated a traffic stop for running through the scene almost causing an accident. The officers categorized the event in the WatchGuard System as Unknown, an investigated 2-black males.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and uninsured vehicle. The vehicle was towed. The two black males also had warrants however, no arrest were made.

On January 3, 2019, Officer Steele, wearing body worn camera serial number WFC1-007005, working with Officer E, both assigned to the Sixth Precinct, conducted a traffic stop at 17:22, 17:33,17:55, 18:04, 18:13, 18:29, and investigated one black female and one black male. The officers initiated the traffic stop for expired plate. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and uninsured motor vehicle. The vehicle was towed. The black female also had warrants however, an arrest was not made.

On January 8, 2019, Officer Steele, wearing body worn camera serial number WFC1-004336, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 21:20, and investigated a black female. The officers initiated the traffic stop for glaring headlights. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, glaring, and expired plates, the vehicle was towed. The black female also had warrants however, an arrest was not made.

On January 10, 2019, Officer Steele, wearing body worn camera serial number WFC1-031946, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 20:25, and investigated a black male. The officers initiated the traffic stop for improper plate. The officers categorized the event in the WatchGuard System as a Miscellaneous Investigation.
**Disposition:** Issued an ordinance for unregistered motor vehicle the vehicle was towed. The black male also had warrants however, an arrest was not made.

On January 10, 2019, Officer Steele, wearing body worn camera serial number WFC1-031946, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 21:47, and investigated a black male. The officers initiated the traffic stop for expired plate. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.

21

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

**Disposition:** Issued ordinances for expired plate, uninsured motor vehicle, and unregistered motor vehicle, the vehicle was towed.

On January 11, 2019, Officer Steele wearing body worn camera serial number WFC1-033886, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 19:20, and investigated a black female. The officers initiated the traffic stop for glaring headlights. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle. Officer Steele stated **"Where is Keisha going in a hurry?"** Officer Garrison replied, "Oh, she lives down there somewhere." Officer Steele stated, "She in a hurry to get home," 4 minutes and 5 seconds into the video.
**Disposition:** Issued ordinances for driving with glaring headlights, and defective license plate the vehicle was not towed.

On January 14, 2019, Officer Steele wearing body worn camera serial number WFC1-037607, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 19:31, and investigated a black female. The officers initiated the traffic stop for canceled plates per S.O.S. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle. Officer Steele stated **"Keisha don't have a license"** 2 minutes and 59 seconds into the video.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and uninsured motor vehicle, the vehicle was towed.

On January 15, 2019, Officer Steele, wearing body worn camera serial number WFC1-024769, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 19:48, 20:01, and 20:07, and investigated a black male. The officers initiated the traffic stop for disregard red signal. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and uninsured motor vehicle, the vehicle was towed. The black male also had warrants however, an arrest was not made.

On January 17, 2019, Officer Steele wearing body worn camera serial number WFC1-033886, working with Officer F, both assigned to the Sixth Precinct, conducted a traffic stop at 23:04 and investigated a black male. The officers initiated the traffic stop for expired plate. The officers categorized the event in the WatchGuard System as Unknown.
**Disposition:** Issued ordinances for glaring headlight and expired plate, the vehicle was towed.

On January 18, 2019, Officer Steele, wearing body worn camera serial number WFC1-030348, working with Officer F, both assigned to the Sixth Precinct, conducted a traffic stop at 19:59 and investigated a black male for expired plate. The officers categorized the event in the WatchGuard System as Unknown. The camera was turned off by Officer Steele before the investigation had concluded.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and uninsured motor vehicle, the vehicle was towed.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

On January 19, 2019, Officer Steele, wearing body worn camera serial number WFC1-011769, working with Officer F, both assigned to the Sixth Precinct, conducted a traffic stop at 18:33 and investigated a black female. The officers initiated the traffic stop for glaring headlights. The officers categorized the event in the WatchGuard System as Unknown. The camera was turned off by Officer Steele before the investigation had concluded.
**Disposition:** Issued ordinances for no operators permit, unregistered motor vehicle, and uninsured motor vehicle, the vehicle was towed.

On January 22, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037728, working with Officer Gary Steele, badge 4279, both assigned to the Sixth Precinct, initiated a traffic stop at 18:40, and investigated what appeared to be Arabic male, but documented as a White male, for glaring lights.  Officer Garrison states 4 minutes and 35 seconds into the video time frame of 18:40, a **"Fucking Terrorist."**  At 18:47, a second video was started for unknown reasons. At 18:59, a third video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons.  Officer Steele stops the third video for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for unregistered motor vehicle, and uninsured motor vehicle. The vehicle was towed.

On January 22, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037728, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 20:27 and investigated the driver a black male and passenger black female for canceled plate through the Secretary of State (S.O.S.).  Officer Garrison stated three minutes and twenty-two seconds into the video, **"I'll write Keisha a fucking ticket too, she's sitting right next to him."**  Officer Garrison stops the first video for unknown reasons.  At 20:53, a second video was started for the same traffic stop.  Officer Steele turns off the second video for unknown reasons.  The officers categorized both of the events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for unregistered motor vehicle and uninsured registered vehicle. The vehicle was towed.  The driver black male had warrants and the passenger black female also had warrants however, no arrests were made.

On January 25, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037068, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 17:26 and investigated a one black male, and passenger one black female for driving vehicle with expired plate.  At 17:44, a second video was started for the same traffic stop.  Officer Garrison stops both of the videos for unknown reasons.  Officer Garrison stated 3 minutes and 55 seconds into the video time frame of 17:44, **"Ok, you do that then Keisha."**  The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for allowing person to drive with no license (given to passenger), driving while license suspended, and uninsured motor vehicle. The vehicle was towed.  The driver, a black male had warrants and the passenger, a black female, also had warrants however, no arrest was made.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

On January 25, 2019, Officer Steele, wearing body worn camera serial number WFC1-011747, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 21:46, 22:05, and 22:41, and investigated a black female. The officers initiated the traffic stop for obscured temporary tag in the rear window. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued an ordinance for driving while license suspended, the vehicle was towed. The black female had warrants, however, she was not arrested.

On January 26, 2019, Officer Steele, wearing body worn camera serial number WFC1-037757, working with Officer F, both assigned to the Sixth Precinct, responded to an accident at 18:20, 18:51, and investigated two black males. The officers categorized the event in the WatchGuard System as a Traffic Accident.
**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, and failed clear distance the vehicle was towed. The black male had warrants however, he was not arrested.

On January 28, 2019, Officer Steele, wearing body worn camera serial number WFC1-011742, working with Officer D, both assigned to the Sixth Precinct, conducted a traffic stop at 21:57, 10:42, and investigated a black female. The officers initiated the traffic stop for unknown reasons, as it was not indicated on the Officer's Daily Report. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle. The name **"Keisha"** was referenced 7 minutes and 30 seconds into the video.
**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, and unregistered motor vehicle, the vehicle was towed. The black female had warrants however, she was not arrested.

On January 29, 2019, Officer Steele, wearing body worn camera serial number WFC1-003525, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 21:31, and investigated a black female. The officers initiated the traffic stop for expired plate. On Officer Garrison's body worn camera serial number WFC1-043909, he informed the black female to call for a ride while waiting for the tow truck. The black female exited the vehicle she stated **"She's was going to walk home around the corner."** The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for uninsured motor vehicle, and unregistered motor vehicle, the vehicle was towed.

On January 29, 2019, Officer Garrison, wearing body worn camera serial number WFC1-043909, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 22:35, and investigated black female for expired plates. For the event time frame of 22:35, However, Officer Steele stated **"Is that Keisha?"** and Officer Garrison replied 4 minutes and 8 seconds into the video and states **"Yep, Keisha calling for a ride"** to his partner. At 22:51, a second video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons. The officers categorized the events in the WatchGuard System as Investigate Person/Vehicle and Family Trouble/Disturbance.

24

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, and unregistered motor vehicle. The vehicle was towed. The black female driver also had warrants however, an arrest was not made.

_Detailed Findings_

The following tables display the Investigative Stops, Traffic Stops, and Towing Activities for Police Officer Gary Steele, Badge 4279.

| Investigated Persons by Race/Gender | | | |
|---|---|---|---|
| Time Period | Black Female | Black Male | Arabic Male |
| Dec-18 | 6 | 8 | 0 |
| Jan-19 | 11 | 10 | 1 |
| Total | 17 | 18 | 1 |

As displayed in the table above, in December of 2018, 6/14 (43%) of investigated persons were black female, 8/14 (57%) were black male.

In January of 2019 11/22 (50%) of investigated persons were black female, 10/22 (45%) were black male, 1/22 (5%) were Arabic Male.

| Tow Activities | | | |
|---|---|---|---|
| Time Period | Tows from Traffic Stops | Tows from Accidents | Totals |
| Dec-18 | 8 | 3 | 11 |
| Jan-19 | 16 | 1 | 17 |
| Total | 24 | 4 | 28 |

As displayed in the table above, in December of 2018, 8/11 (73%) of Officer Steele's tows were related to traffic stops, 3/11 (27%) were from accidents.

In January of 2019, 16/17 (94%) tows were related to traffic stops, 1/17 (5%) were from accidents.

_Conclusion and Insight_

The review of Officer Steele's Officers Daily Report contained information related to the race or gender of individuals who were encountered during traffic or investigative stops. This information was obtained by reviewing the Officer's Daily report and the Body Worn Camera events.

The Body Worn Camera events revealed the reasons for the traffic stops entailed: speeding, defective headlights, expired plates, obscured license plate, improper passing, failed to yield, glaring headlights, disregard red signal, canceled plate in Secretary of State (S.O.S.). During the

25

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

investigations the ordinances were Issued resulting in the following that are included but not limited to: failed two signal, unregistered motor vehicle, driving while license suspended, glaring headlights, and expired plates, disregard red signal, defective license plate, no valid plate, unregistered motor vehicle, obscured temporary tag, uninsured motor vehicle, and no proof of insurance.

It should be noted, Officer Steele referred to African American females as "Keisha" several times in the video review events.  Officer Steele also made a comment regarding the "walk of shame," mentioned in the above synopsis.  It should be noted that I did not observe Officer Steele partner with any other minority or ethnicity, during the above mentioned video events for the specific dates reviewed.

Commanding Officers should initiate an Investigation and Report regarding Police Officer Steele and Police Officer Garrison's body worn camera events.  This should be done within the next ninety days before the expiration of the body worn camera footage.

The video events for Officers Steele and Garrison revealed their conduct in relation to their care and treatment of citizens during traffic stops should be addressed.

 There's a concern that newer officers have been exposed to the conduct exhibited by Officer Steele and have modeled their conduct from his.

Sixth Precinct supervisors should conduct daily video reviews and forward their findings to Civil Rights Division of all field deployed patrol personnel. In addition, that the Commanding Officers ensure that in-service training is conducted as it relates to care and treatment of all citizens regardless of race, ethnicity, or social status.

All of the Officers assigned to the Sixth Precinct should receive mandatory discrimination, and sensitivity training. The race and gender of the members assigned to the Sixth Precinct should be more diverse.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

*Scope of Review* —Michael Garrison
The Civil Rights Body Worn Camera Team performed reviews of the WatchGuard Video System observing the data for the months of December 2018 and January 2019 in relation to the citizen contacts and towing activities of Police Officer Michael Garrison, Badge 4185.

*Methodology*
On December 2, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041351, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 17:29 and investigated a black male and black female for expired plates. The category in which the video was placed in the WatchGuard System could not be obtained due to the 90-Day retention. However, Officer Garrison referenced 3 minutes and 12 seconds into the video and stated **"With his little skilly Bob Keisha."** Officer Garrison stops the video for unknown reasons.
**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, unregistered motor vehicle, and allowing unlicensed driver to drive to the owner of the vehicle. The vehicle was towed.

On December 2, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041351, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 19:49, and investigated a black male for expired plates. At 19:58, a second video was started for the same traffic stop. Officer A stops the videos for unknown reasons. The category's in which the video were placed in the WatchGuard System could not be obtained due to the 90-Day retention.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, no insurance, and allowing unlicensed driver to drive to the owner of vehicle. The vehicle was towed.

On December 2, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041351, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 22:05, and investigated a black male for glaring headlights and license plate lamp out. Officer Garrison stops the video for unknown reasons. The category in which the video was placed in the WatchGuard System could not be obtained due to the 90-Day retention.
**Disposition:** Issued ordinances for no license never acquired, and uninsured motor vehicle. The vehicle was towed. The driver was arrested for carrying a concealed weapon.

On December 4, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041977, working with Officer G, both assigned to the Sixth Precinct initiated a traffic stop at 18:01, and investigated a black female for defective license plate lamp. At 18:20, a second video was started for the same traffic stop. Officer Garrison stops both videos for unknown reasons. The category's in which the video were placed in the WatchGuard System could not be obtained due to the 90-Day retention.
**Disposition:** Issued ordinances for driving while license suspended, and uninsured motor vehicle. The vehicle was towed.

## ENVIRONMENTAL AUDIT
### (CONFIDENTIAL DOCUMENT)

On December 4, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041977, working with Officer G, both assigned to the Sixth Precinct, initiated a traffic stop at 20:39, and investigated a black female for improper plate. The category in which the video was placed in the WatchGuard System could not be obtained due to the 90-Day retention. Officer G stops the video for unknown reasons.

**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, and improper plate. The vehicle was towed. The black female also had warrants however, an arrest was not made.

On December 4, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041977, working with Officer G, both assigned to the Sixth Precinct, initiated a traffic stop at 21:20, and investigated a black female with four children for obstructed plate not on car. At 21:28, a second video was started for unknown reasons. At 21:32, a third video was started for the same traffic stop. Officer Garrison stops all of the videos for unknown reasons. The category's in which the videos were placed in the WatchGuard System could not be obtained due to the 90-Day retention.

**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, providing false information, fail to restrain child in back seat, and allowing unlicensed driver to drive to owner of vehicle. The vehicle was towed. The black female also had a warrants however, an arrest was not made.

On December 4, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041977, working with Officer G, both assigned to the Sixth Precinct, initiated a traffic stop at 22:41, and investigated a black male for glaring headlights. Officer Garrison stopped the video for unknown reasons. The category in which the video was placed in the WatchGuard System could not be obtained due to the 90-Day retention.

**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, and unregistered motor vehicle. The vehicle was towed.

On December 6, 2018, Officer Steele, wearing body worn camera serial number WFC1-041341, working with Officer Garrison, both assigned to the Sixth Precinct, conducted an investigation at 21:36 and investigated a black female. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle. However, referenced 5 minutes and 21 seconds into the video that **"I usually wait until about 10:30, to give them the walk of shame."**

**Disposition:** Courtesy conveyance home.

On December 6, 2018, Officer Steele, wearing body worn camera serial number WFC1-041341, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 22:10, and investigated a black female. The officers initiated the traffic stop for expired plates and categorized the event in the WatchGuard System, as a Traffic Investigation. However, referenced 59 seconds into the video, **"Think it's a Keisha?"**

**Disposition:** Issued ordinances for driving while licenses suspended, uninsured motor vehicle, and unregistered motor vehicle, the vehicle was towed. The black female also had warrants however, an arrest was not made.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

On December 7, 2018, Officer Garrison, wearing body worn camera serial number WFC1-037068, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 19:28, and investigated a black female for cancelled plate by secretary of state. At 20:11, a second video was started for the same traffic stop. Officer A stops both of the videos for unknown reasons. The officers categorized both events in WatchGuard System as Investigate Person/Vehicle. **Disposition:** Issued ordinances for no license never acquired, uninsured motor vehicle, and unregistered motor vehicle. The vehicle was towed.

On December 7, 2018, Officer Garrison, wearing body worn camera serial number WFC1-037068, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 21:27, and investigated a black male for bright headlights. Officer Garrison turned off the first video for unknown reasons. Officer A stops the second video for unknown reasons. At 21:37, Officer Garrison referenced two minutes and twenty-seven seconds into the video states **"And that's a walk of shame."** The officers categorized both events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for uninsured motor vehicle, and suspended license. The vehicle was towed.

On December 9, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041141, working with Officer D, both assigned to the Sixth Precinct, initiated a traffic stop at 20:04, and investigated a black male for disregarding a traffic control device and not treating an out traffic control device as a four way stop. Officer D stops the video for unknown reasons. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for careless driving, expired plates, and no insurance motor vehicle. The vehicle was towed.

On December 10, 2018, Officer Garrison, wearing body worn camera serial number WFC1-011747, working with Control Officer H, both assigned to the Sixth Precinct, initiated a traffic stop at 22:09, and investigated two black males for improper plate on vehicle. At 23:06, a second video is started for the same traffic stop. Both videos are stopped for unknown reasons. The officers categorized both events in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and improper plates. The vehicle was towed.

On December 10, 2018, Officer Garrison, wearing body worn camera serial number WFC1-011747, working with Control Officer H, both assigned to the Sixth Precinct, initiated a traffic stop at 23:54. The information of who was investigated is unknown due to lack of notations cited on the Officers Daily Report. The category's in which the video were placed in the WatchGuard System could not be obtained due to the 90-Day retention.
**Disposition:** Unknown due to lack of notation on the Officers Daily Report however, the vehicle was towed.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

On December 11, 2018, Officer Steele, wearing body worn camera serial number WFC1-028172, working with Officer Garrison, both assigned to the Sixth Precinct conducted, a traffic stop at 22:00, and investigated a black female. The officers initiated the traffic stop for obscured plate. The officers categorized the event in the WatchGuard System, as Investigate Person/Vehicle. However, 7 minutes and 52 seconds into the video Officer Steele asked "anyone in the car with her" and Officer Garrison replied **"Another Keisha."**
**Disposition:** Issued ordinances for uninsured motor vehicle and no valid driver's license, the vehicle was towed. The black female also had warrants however, an arrest was not made.

On December 16, 2018, Officer Garrison, wearing body worn camera serial number WFC1-031406, working with Officer B, wearing body worn camera serial number WFC1-022232, both assigned to the Sixth Precinct, initiated a traffic stop at 19:46, and investigated a black female for failing to stop at a red signal. At 19:57, a second video was started for unknown reasons. At 20:00, a third video was started for unknown reasons. Officer B stops all of the videos for unknown reasons. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for disregard traffic signal, unregistered motor vehicle, and uninsured motor vehicle. The vehicle was towed.

On December 16, 2018, Officer Garrison, wearing body worn camera serial number WFC1-031406, working with Officer B, wearing body worn camera serial number WFC1-022232, both assigned to the Sixth Precinct, initiated a traffic stop at 21:31, and investigated the driver, a black female, and passenger, a black male, for failing to stop at a red signal. At 21:36, a second video was started for the same traffic stop. At 21:47, a third video was started for the same traffic stop. At 21:55, a fourth video was started for the same traffic stop. Officer B stops all of the videos for unknown reasons. The officers categorized all of the events in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for disregard traffic signal, and driving while license suspended. The vehicle was towed.

On December 16, 2018, Officer Garrison, wearing body worn camera serial number WFC1-031406, working with Officer B, both assigned to the Sixth Precinct, initiated a traffic stop at 22:40, and investigated the driver a black female and passenger a black male for license plate lights out. At 22:54, a second video was started for the same traffic stop. At 23:30, a third video was started for the same traffic stop. At 23:32 a fourth video was started for the same traffic stop. The videos from the traffics stops turns off for unknown reasons. Officer Garrison stated 33 seconds into the video time frame of 23:40 **"Bam there's our walk of shame."** The officers categorized the events in the WatchGuard System as Investigate Person/ Vehicle.
**Disposition:** Issued ordinances for no operators permit, and uninsured motor vehicle. The vehicle was towed.

On December 17, 2018, Officer Garrison, wearing body worn camera serial number WFC1-033609, working with Officer I, both assigned to the Sixth Precinct, initiated a traffic stop at 18:03, and investigated the driver a black female and passenger a black male for expired license. At 18:18, a second video was started for the same traffic stop. At 18:21, a third video was started

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

for the same traffic stop. At 18:26, a fourth video was started for the same traffic stop. Officer I stops all of the videos for unknown reasons. The officers categorized the events in the WatchGuard System as Unknown and Traffic Investigations.

**Disposition:** Issued ordinances for no operators permit, unregistered motor vehicle, and no proof of insurance. The vehicle was towed.

On December 17, 2018, Officer Garrison, wearing body worn camera serial number WFC1-033609, working with Officer I, both assigned to the Sixth Precinct, initiated a traffic stop at 22:17,and investigated a black male for wrong license plate. At 22:38 a second video was started for the same traffic stop. At 22:56, a third video was started for the same traffic stop. At 23:19, a fourth video was started for the same traffic stop. Officer I stops all of the videos for unknown reasons. The officers categorized the events in the WatchGuard System as Unknown and Traffic Investigations.

**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and no proof of insurance. The vehicle was towed.

On December 18, 2018, Officer Garrison, wearing body worn camera serial number WFC1-029989, working with Officer D, both assigned to the Sixth Precinct, initiated a traffic stop at 18:50, and investigated a black female for a wrong license. At 19:10, a second video was started for the same traffic stop. Officer Garrison stops both videos for unknown reasons. The officers categorized both events in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for wrong plate, improper plate, and uninsured motor vehicle. The vehicle was towed.

On December 18, 2018, Officer Garrison, wearing body worn camera serial number WFC1-029989, working with Officer D, both assigned to the Sixth Precinct, initiated a traffic stop at 20:45, and investigated a black male for speeding. At 21:10, a second video was started for the same traffic stop. Officer D stops all of the videos for unknown reasons. The officers categorized both events in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for driving while license suspended, failed to stop at stop sign, and uninsured motor vehicle. The vehicle was towed.

On December 19, 2018, Officer Garrison, wearing body worn camera serial number WFC1-011785, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 17:30, and investigated a black female for expired license plate. At 17:40, a second video was started for unknown reasons. Officer Garrison stops the first video for unknown reasons. Officer A stops the second video for unknown reasons. The officers categorized the events in the WatchGuard System as Investigate Person/Vehicle and Traffic Investigation.

**Disposition:** Issued ordinances for uninsured motor vehicle, unregistered motor vehicle, and no operators permit. The vehicle was towed.

On December 19, 2018, Officer Garrison, wearing body worn camera serial number WFC1-011785, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 20:17, and investigated a black male for a cancelled license plate. It was undetermined which

31

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

officer stopped the video for unknown reasons. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for no operators permit, and no valid license plate. The vehicle was towed.

On December 19, 2018, Officer Garrison, wearing body worn camera serial number WFC1-011785, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 21:27, and investigated the driver a black male and passenger a black female for canceled license plate. Officer Garrison stated forty eight seconds into the video **"Looks like Keisha I don't know."** At 21:38, a second video was started for unknown reasons. At 21:44, a third video was started for unknown reasons. Officer Garrison stops the first video for unknown reasons. The camera turns off on the second and third video for unknown reasons. The officers categorized the events in the WatchGuard System as Traffic Investigation and Investigate Person/Vehicle.

**Disposition:** Issued ordinances for no valid license plate, and unregistered motor vehicle. The vehicle was towed.

On December 19, 2018, Officer Garrison, wearing body worn camera serial number WFC1-011785, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 22:43, and investigated two black males for improper license plate. Officer Garrison stops the video for unknown reasons. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for, no valid license plate, unregistered motor vehicle, and no operators permit. The vehicle was towed. The driver black male had warrants however, an arrest was not made.

On December 21, 2018, Officer Garrison, wearing body worn camera serial number WFC1-007005, working with Officer F, both assigned to the Sixth Precinct, initiated a traffic stop at 18:38, and investigated a black female for defective license plate lamp. At 18:45, a second video is started for the same traffic stop. P.O. Garrison stops both of the videos for unknown reasons. The officers categorized both of the events in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinance for no operators permit. The vehicle was towed.

On December 23, 2019, Officer Garrison, wearing body worn camera serial number WFC1-041633, working with Officer F, both assigned to the Sixth Precinct, initiated a traffic stop at 17:54, and investigated a black male for defective license plate lamp. At 18:07, a second video was started for the same traffic stop. Officer F stops both of the videos for unknown reasons. The officers categorized both of the events in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for driving while licensed suspended, drive unregistered or untitled vehicle, uninsured motor vehicle, and allowing unlicensed driver to drive for the owner of the vehicle. The vehicle was towed. The black male also had warrants however, an arrest was not made.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

On December 23, 2018, Officer Garrison, wearing body worn camera serial number WFC1-041633, working with Officer F, both assigned to the Sixth Precinct, initiated a traffic stop at 22:16, and investigated 2-black females with two children for fraudulent plates. At 22:44, a second video was started for the same traffic stop. Officer F stops both of the videos for unknown reasons. The officers categorized both of the events in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for driving while license suspended, improper plates, driving unregistered or untitled vehicle, and uninsured motor vehicle. The vehicle was towed. The black female driver had warrants however, an arrest was not made.

On December 25, 2018, Officer Garrison, wearing body worn camera serial number WFC1-043992, working with Officer F, both assigned to the Sixth Precinct, initiated a traffic stop at 21:00, and investigated a black male for unknown reason. It was cited on the Officers Daily Report that Officer Garrison's body worn camera was dead and on the charger inside the vehicle. Officer F's body worn camera serial number WFC1-029989, captured the traffic stop. Officer Garrison stops the video for unknown reasons. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for driver's license never acquired, and unregistered or untitled motor vehicle. The vehicle was towed.

On December 26, 2018, Officer Garrison, wearing body worn camera serial number WFC1-003525, working with Officer J, both assigned to the Sixth Precinct, initiated a traffic stop at 20:03, and investigated a black female for glaring lights. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, uninsured motor vehicle, and glaring headlights. The vehicle was towed.

On December 29, 2018, Officer Garrison, wearing body worn camera serial number WFC1-004336, working with Officer K, both assigned to the Sixth Precinct, initiated a traffic stop at 18:41, and investigated a black female for disregard traffic control device. At 18:53, a second video was started for the same traffic stop. Officer K stops both of the videos for unknown reasons. The officers categorized both of the events in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and Disregard Traffic Control Device. The vehicle was towed. The black female also had warrants however, an arrest was not made.

On December 29, 2018, Officer Garrison, wearing body worn camera serial number WFC1-004336, working with Officer K, both assigned to the Sixth Precinct, initiated a traffic stop at 20:20, and investigated the driver a black female and passengers two black males, for driving with bright lights on. Officer Garrison references 17 minutes and 18 seconds into the video of 20:20, stating **"the only thing that we have a choice is you see these fancy cameras that was put down by the Chief, is if there's an unlicensed driver no if ands or buts being impounded, don't have insurance being impounded, bad plate, the only thing we do have a choice in is**

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

whether she goes to jail for driving without a license. So as far as the car not being impounded, I don't have a choice in that see what I'm saying, everybody wanted us to have these fancy body cams and well they're here." Officer K stops the video for unknown reasons. At 20:53, a second video was started for the same traffic stop, and the video turns off for unknown reasons. The officers categorized the events in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and open intoxicants to the passenger. The vehicle was towed. The black female had warrants and the passenger black male also had warrants however, an arrest was not made.

On December 30, 2018, Officer Garrison, wearing body worn camera serial number WFC1-004336, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 18:35, and investigated a black male for driving with bright lights on. At 18:56, a second video was started for the same traffic stop. Officer A stops the video in the first event for unknown reasons. In the second video the camera turns off for unknown reasons. The officers categorized the events in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for no operators permit, unregistered motor vehicle, uninsured motor vehicle, and glaring headlights. The vehicle was towed.

On December 30, 2018, Officer Garrison, wearing body worn camera serial number WFC1-004336, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 22:20, and investigated 2-black males, for driving with bright lights on. In the first video the camera shuts off for unknown reasons. At 22:40, a second video was started for the same traffic stop. Officer Garrison stops the second video for unknown reasons. The officers categorized both of the events in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for no operators permit, driving while license suspended, uninsured motor vehicle, and glaring headlights. The vehicle was towed.

On January 4, 2019, Officer Garrison, wearing body worn camera serial number WFC1-041976, working with Officer L, both assigned to the 6th Precinct, conducted a traffic stop at 17:45, and investigated a black female. The officers initiated the traffic stop for an expired license plate. At 17:58, a second video was started for the same traffic stop. Officer Garrison stops all of the videos for unknown reasons. The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for uninsured motor vehicle, no registration, and no operators permit. The vehicle was towed. The black female had warrants however, an arrest was not made.

On January 6, 2019, Officer Garrison, wearing body worn camera serial number WFC1-041613, working with Officer B, both assigned to the 6th Precinct, conducted a traffic stop at 17:11, and investigated a black male for defective rear left turn signal. At 17:22, a second video is started for the same traffic stop. At 17:39, a third video was started for the same traffic stop. Officer Garrison stops all of the videos for unknown reasons. The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances to the driver for defective turn signal, driving while license suspended, and no proof of insurance. The officers also issued an ordinance to the registered

34

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

owner who was not at the scene for allowing an unlicensed driver to drive.  The vehicle was towed.

On January 6, 2019, Officer Garrison, wearing body worn camera serial number WFC1-041613, working with Officer B, both assigned to the 6th Precinct, conducted a traffic stop at 20:43, and investigated a black female.  There were several other passengers in the vehicle, when the traffic stop was initiated for defective equipment (headlight and license plate light). Approximately 54 seconds into the video while they are still in their scout car Officer Garrison says, **"Hi Keisha!"** and comments **"Oh we've got heads popping up all over the place."**  Officer B stops the video for unknown reasons.  At 21:07, a second video was started for the same traffic stop.  At 21:16, a third video was started for the same traffic stop. Officer Garrison stops all of the videos for unknown reasons.  The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, and operating an uninsured motor vehicle. The vehicle was towed.

On January 6, 2019, Officer Garrison, wearing body worn camera serial number WFC1-041613, working with Officer B, both assigned to the 6th Precinct, conducted a traffic stop at 22:33, and investigated a black female for varying course of travel without signal.  At 22:44, a second video was started for the same traffic stop.  At approximately two minutes and 36 seconds into the second video, Officer Garrison refers to the **"walk of shame."**  Officer Garrison stops all of the videos for unknown reasons.  The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle.
 **Disposition:** Issued ordinances for driving while license suspended, no proof of insurance, and vary course w/o signal. The vehicle was towed. The black female had warrants, however an arrest was not made.

On January 7, 2019, Officer Garrison wearing body worn camera serial number WFC1-010166, working with Officer A, both assigned to the 6th Precinct conducted a traffic stop at 17:45, and investigated a black female for disregarding a stop sign and driving without headlights on. Approximately 1 minute into the traffic stop Officer Garrison states **"Already we're dealing with somebody extremely stupid."**  At 18:03, a second video was started for the same traffic stop. Officer Garrison stops the videos for unknown reasons.  The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** the officers issue ordinances for driving while license suspended, uninsured motor vehicle, careless driving, and disregard stop sign. The vehicle was towed.

On January 7, 2019, Officer Garrison, wearing body worn camera serial number WFC1-010166, working with Officer A, both assigned to the 6th Precinct conducted a traffic stop at 21:16, and investigated a black female and black male for defective equipment (headlight).  At 21:31, a second video was started for the same traffic stop. Officer A stops the videos for unknown reasons.  The officers categorized the events in the WatchGuard system as a Traffic Investigation and Investigate Person/Vehicle.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

**Disposition:** Issued ordinances to the driver for driving while license suspended, uninsured motor vehicle, unregistered motor vehicle, and allowing passenger to be unbuckled in back seat. The registered owner who was a passenger in the vehicle was issued an ordinance for allowing unlicensed driver to drive. The vehicle was towed.

On January 7, 2019, Officer Garrison, wearing body worn camera serial number WFC1-010166, working with Officer A, both assigned to the 6th Precinct conducted a traffic stop at 22:36 and investigated a black female and black male for headlight out. At 22:50, a second video was started for the same traffic stop. Officer Garrison stops the videos for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued an ordinances to the black female for driving while license suspended, and uninsured motor vehicle. The officer also issued an ordinance to the registered owner black male for allowing unlicensed driver to drive. The vehicle was towed.

On January 8, 2019, Officer Steele, wearing body worn camera serial number WFC1-004336, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 21:20 and investigated a black female. The officers initiated the traffic stop, for glaring headlights. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, glaring, and expired plates the vehicle was towed. The black female also had warrants however, an arrest was not made.

On January 10, 2019, Officer Steele, wearing body worn camera serial number WFC1-031946, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 20:25 and investigated a black male. The officers initiated the traffic stop, for improper plate. The officers categorized the event in the WatchGuard System as a Miscellaneous Investigation.
**Disposition:** Issued an ordinance for unregistered motor vehicle the vehicle was towed. The black male also had warrants however, an arrest was not made.

On January 10, 2019, P Officer Steele, wearing body worn camera serial number WFC1-031946, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 21:47 and investigated a black male. The officers initiated the traffic stop for expired plate. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for expired plate, uninsured motor vehicle, and unregistered motor vehicle, the vehicle was towed.

On January 11, 2019, Officer Steele wearing body worn camera serial number WFC1-033886, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 19:20, and investigated a black female. The officers initiated the traffic stop for glaring headlights. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle. Officer Steele stated **"Where is Keisha going in a hurry."** Officer Garrison replied "oh she lives down there somewhere'" Officer Steele stated "she in a hurry to get home" 4 minutes and 5 seconds into the video.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

**Disposition:** Issued ordinances for driving with glaring headlights, and defective license plate the vehicle was not towed.

On January 13, 2019, Officer Garrison, wearing body worn camera serial number WFC1-041976, working with Officer E, both assigned to the 6th Precinct conducted a traffic stop at 21:49, and investigated a black male, for expired license plates. At 21:59, a second video was started for the same traffic stop. Officer E stops both videos for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.

**Disposition:** Issued ordinances to the black male for unregistered motor vehicle, and uninsured motor vehicle. The vehicle was towed.

On January 14, 2019, Officer Steele wearing body worn camera serial number WFC1-037607, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 19:31, and investigated a black female. The officers initiated the traffic stop for canceled plates per S.O.S. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle. Officer Steele stated **"Keisha don't have a license"** 2 minutes and 59 seconds into the video.

**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and uninsured motor vehicle, the vehicle was towed.

On January 15, 2019, Officer Steele, wearing body worn camera serial number WFC1-024769, working with Officer Garrison, both assigned to the Sixth Precinct, conducted a traffic stop at 19:48, 20:01, and 20:07, and investigated a black male. The officers initiated the traffic stop for disregard red signal. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and uninsured motor vehicle, the vehicle was towed. The black male also had warrants however, an arrest was not made.

On January 17, 2019, Officer Garrison, wearing body worn camera serial number WFC1-033605, working with Officer B, both assigned to the 6th Precinct conducted a traffic stop at 22:00 and investigated a black male for defective license plate light and driver not wearing a seatbelt. At 22:13, a second video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.

**Disposition:** Issued ordinances to the black male for driving while license suspended, defective lights and failure to wear a seatbelt. The officers also issued an ordinance to the registered owner who was not at the scene for allowing an unlicensed driver to drive. The vehicle was towed. The black male had warrants, however an arrest was not made.

On January 18, 2019, Officer Garrison, wearing body worn camera serial number WFC1-005820, working with Control Officer H, both assigned to the 6th Precinct conducted a traffic stop at 21:04 and investigated the driver a black female and black male for glaring headlights. The first video was stopped for unknown reasons. At 21:10, a second video was started for the same traffic

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

stop. Officer Garrison stops the second video for unknown reasons. At 21:47, a third video was started for the same traffic stop. The third video was stopped for unknown reasons. The officers categorized the events in the WatchGuard system as Traffic Investigation and Investigate Person/Vehicle.

**Disposition:** Issued ordinances to the black female for license never acquired, uninsured motor vehicle, and glaring headlights. The officers also issued an ordinance to the registered owner who was a passenger in the vehicle for allowing an unlicensed driver to drive. The vehicle was towed. The driver a black female had warrants and the passenger black male had warrants, however an arrest was not made.

On January 18, 2019, Officer Garrison, wearing body worn camera serial number WFC1-005820, working with Control Officer H, both assigned to the 6th Precinct conducted a traffic stop at 22:30 and investigated a black female for headlight out and invalid license plate. Control Officer H stops the video for unknown reasons. At 22:45, a second video is started for the same traffic stop. The second video is stops for unknown reasons. The officers categorized the event in the WatchGuard system as Traffic Investigation.

**Disposition:** Issued ordinances to the black female for no operators permit, unregistered vehicle, and uninsured motor vehicle. The black female had warrants, however an arrest was not made. The vehicle was towed.

On January 19, 2019, Officer Garrison, wearing body worn camera serial number WFC1-028193, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 20:35, and investigated a black male for an expired license plate. At 20:47, a second video was started for the same traffic stop. Officer Garrison stops the videos for unknown reasons. The officers categorized the events in the WatchGuard system as Traffic Investigation.

**Disposition:** Issued ordinances for driving while no license acquired, unregistered motor vehicle, uninsured motor vehicle, and allowing passenger without seat belt (7 year old female). The vehicle was towed.

On January 19, 2019, Officer Garrison, wearing body worn camera serial number WFC1-028193, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 21:53, and investigated a black male for expired license plate. At 22:05, a second video was started for the same traffic stop. Officer Garrison stops both videos for unknown reasons. The officers categorized the events in the WatchGuard system as Traffic Investigation.

**Disposition:** Issued ordinances for expired plate, and uninsured motor vehicle. The vehicle was towed.

On January 20, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037728, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 18:51, and investigated a black female for an unregistered motor vehicle. At 19:00, a second video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.

**Disposition:** Issued ordinance for no operators permit. The vehicle was towed. The black female had warrants however, an arrest was not made.

38

## ENVIRONMENTAL AUDIT
### (CONFIDENTIAL DOCUMENT)

On January 20, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037728, working with Officer A, both assigned to the Sixth Precinct, initiated a traffic stop at 20:30 and investigated a black male for an unregistered motor vehicle. The video turns off for unknown reasons. The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for no operators permit, unregistered motor vehicle, and uninsured motor vehicle. The vehicle was towed.

On January 22, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037728, working with Officer Gary Steele, badge 4279, both assigned to the Sixth Precinct, initiated a traffic stop at 18:40, and investigated what appeared to be Arabic male, but documented as white male, for glaring lights. Officer Garrison states four minutes and thirty-five seconds into the video time frame of 18:40, a **"Fucking Terrorist."** At 18:47, a second video was started for unknown reasons. At 18:59, a third video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons. Officer Steele stops the third video for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for unregistered motor vehicle, and uninsured motor vehicle. The vehicle was towed.

On January 22, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037728, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 20:27, and investigated the driver a black male and passenger black female for cancel plate through the Secretary of State (S.O.S.). Officer Garrison stated 3 minutes and 22 seconds into the video **"I'll write Keisha a fucking ticket too, she's sitting right next to him."** Officer Garrison stops the first video for unknown reasons. At 20:53, a second video was started for the same traffic stop. Officer Steele turns off the second video for unknown reasons. The officers categorized both of the events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for unregistered motor vehicle and uninsured registered vehicle. The vehicle was towed. The driver black male had warrants and the passenger black female also had warrants however, no arrests were made.

On January 22, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037728 working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 21:11, and investigated a black male for driving unregistered plate. Officer Garrison stops the first video for unknown reasons. At 21:25, a second video was started for the same traffic stop. The second video turns off for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for unregistered motor vehicle, no license and uninsured motor vehicle. The vehicle was towed.

On January 23, 2019, Officer Garrison, wearing body worn camera serial number WFC1-039824 working with Officer E, both assigned to the Sixth Precinct, initiated a traffic stop at 18:45, and investigated a black male for driving through a stop sign. At 19:21, a second video was started

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

for the same traffic stop. Officer Garrison asked Officer E 3 minutes and 31 seconds into the video time frame of 19:21 **"Is that a Keisha?"** referring to the owner of the vehicle. The officers categorized the events in the WatchGuard system as Unknown and Misc. Investigation. Officer Garrison stops both of the videos for unknown reasons.

**Disposition:** Issued ordinances for stop sign, glaring lights, driving through a stop sign, no operators permit, disobey a lawful order. In addition the officers wrote a ticket for allowing person to drive without a license Issued to the owner of vehicle, who was not present. The vehicle was towed. An arrest was made for outstanding warrants however, there was no video of the transport to be reviewed.

On January 23, 2019, Officer Garrison, wearing body worn camera serial number WFC1-039824, working with Officer E, both assigned to the Sixth Precinct, initiated a traffic stop at 22:01 and investigated a black male. The officers initiated the traffic stop for driving without headlights. The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle. The video was turned off by Officer E for unknown reasons.

**Disposition:** Issued ordinances for no license ever acquired, no license plate, no seatbelt, driving while using cell phone, uninsured motor vehicle and unregistered motor vehicle. The vehicle was towed.

On January 25, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037068, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 17:26, and investigated a black male, and passenger a black female for driving vehicle with expired plate. At 17:44, a second video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons. Officer Garrison stated 3 minutes and 55 seconds into the video time frame of 17:44 **"Ok, you do that then Keisha."** The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.

**Disposition:** Issued ordinances for allowing person to drive with no license (given to passenger), driving while license suspended, and uninsured motor vehicle. The vehicle was towed. The driver black male had warrants and the passenger black female also had warrants however, no arrest was made.

On January 25, 2019, Officer Garrison, wearing body worn camera serial number WFC1-037068, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 21:46, and investigated a black female for driving unable to see license plate. At 22:05, a second video was started for the same traffic stop. At 22:41, a third video was started for the same traffic stop. Officer Garrison stops the first and third video and Officer Steele stops the second video for unknown reasons. The officers categorized the events in the WatchGuard system as Investigate Person/Vehicle.

**Disposition:** Issued an ordinance for driving while license are suspended and for owner allowing person to drive unlicensed. The vehicle was towed.

On January 26, 2019, Officer Garrison, wearing body worn camera serial number WFC1-031983, working with Officer E, both assigned to the Sixth Precinct, initiated a traffic stop at 19:12, and investigated a black male for improper license plate. At 19:30, a second video was started for

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

the same traffic stop. At 20:14, a third video was started for the same traffic stop. Officer E stops the first video and Officer Garrison stops the second and third video for unknown reasons. The officers categorized the events in the WatchGuard system as Traffic Investigation, Investigate Person/Vehicle, and Unknown.
**Disposition:** Issued ordinances for improper license plate, driving while license suspended, and uninsured motor vehicle. The vehicle was towed.

On January 26, 2019, Officer Garrison, wearing body worn camera serial number WFC1-031983, working with Officer E, both assigned to the Sixth Precinct, initiated a traffic stop at 21:39, and investigated a black male for driving with bright lights on. The officers categorized the events in the WatchGuard system as Traffic Investigation. Officer E stops the video for unknown reasons. There was no other video recording with this traffic stop.
**Disposition:** Issued an ordinances for improper license plate, driving while license suspended and uninsured motor vehicle. The vehicle was towed.

On January 27, 2019, Officer Garrison, wearing body worn camera serial number WFC1-030348, working with Officer A, both assigned to the Sixth Precinct, made accident scene at 22:00, and investigated a black male and a black female. Officer Garrison stated 6 minutes and 2 seconds into the video **"Run Keisha, do she have any license."** Officer Garrison stops the video for the accident scene for unknown reasons. There was no other video recording with this accident investigation. The officers categorized the event in the WatchGuard system as Investigate Person/Vehicle.
**Disposition:** there were no ordinances Issued. Two vehicles were towed privately.

On January 28, 2019, Officer Garrison, wearing body worn camera serial number WFC1-022233, working with Officer E, both assigned to the Sixth Precinct, initiated a traffic stop at 17:01 and investigated a black male for disregard stop sign. At 17:15, a second video was started for the same traffic stop. Officer Garrison stops the videos for unknown reasons. The officers categorized the events in the WatchGuard system as Unknown and Investigate Person/Vehicle.
**Disposition:** Issued ordinances for driving while license suspended, and uninsured motor vehicle. The vehicle was towed.

On January 28, 2019, Officer Garrison, wearing body worn camera serial number WFC1-022233, working with Officer E, both assigned to the Sixth Precinct, initiated at 18:04, and investigated black male for fraudulent plate. In the first time frame at 18:04, Officer Garrison states 33 seconds into the video, **"Hey, motherfucker"** as he's pulling over a vehicle. Also, Officer Garrison states 41 seconds into the video, **"Yeah, you ain't making it home motherfucker."** At 18:17, a second video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons. The officers categorized both events in the WatchGuard System as Investigate Person/Vehicle.
**Disposition:** Issued ordinances for uninsured motor vehicle, and unregistered motor vehicle. The vehicle was towed.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

On January 29, 2019, Officer Garrison, wearing body worn camera serial number WFC1-043909, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 21:32, investigated a black female for expired plates.  At 21:46, a second video was started for the same traffic stop.  Officer Garrison stops the videos for unknown reasons.  The officers categorized both events in the WatchGuard System as Traffic Investigation.
**Disposition:** Issued ordinances unregistered motor vehicle, and uninsured motor vehicle. The vehicle was towed.

On January 29, 2019, Officer Garrison, wearing body worn camera serial number WFC1-043909, working with Officer Steele, both assigned to the Sixth Precinct, initiated a traffic stop at 22:35, and investigated black female for expired plates. For the event time frame of 22:35, Officer Garrison references 4 minutes and 8 seconds into the video and states **"Yep, Keisha calling for a ride."** to his partner. At 22:51, a second video was started for the same traffic stop. Officer Garrison stops both of the videos for unknown reasons. The officers categorized the events in the WatchGuard System as Investigate Person/Vehicle and Family Trouble/Disturbance.
**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, and unregistered motor vehicle. The vehicle was towed. The black female driver also had warrants however, an arrest was not made.

*Detailed Findings*
The following tables display the Findings of the Investigative Stops, Traffic Stops, and Towing Activities for Police Officer Michael Garrison, badge 4185.

| Investigated Persons by Race/Gender | | | |
|---|---|---|---|
| Time Period | Black Female | Black Male | Arabic Male |
| Dec-18 | 21 | 24 | 0 |
| Jan-19 | 18 | 22 | 1 |
| Total | 39 | 46 | 1 |

As displayed in the table above, in December of 2018, 21/45 (47%) of investigated persons were black female, 24/45 (54%) were black male.

In January of 2019 18/41 (44%) of investigated persons were black female, 22/41 (54%) were black male, 1/41 (2%) were Arabic Male.

| Tow Activities | | | |
|---|---|---|---|
| Time Period | Tows from Traffic Stops | Tows from Accidents | Totals |
| Dec-18 | 34 | 0 | 34 |

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

| | | | |
|---|---|---|---|
| **Jan-19** | 33 | 2 | 35 |
| **Total** | **67** | **2** | **69** |

As displayed in the table above, in December of 2018, 34/34 (100%) of Officer Garrison's tows were related to traffic stops, 0/34 (0%) were from accidents.

In January of 2019, 33/35 (94%) tows were related to traffic stops, 2/35 (6%) were from accidents.

*Conclusion and Insight*

The review of Officer Garrison's Officer's Daily Report contained information related to the race or gender of individuals who were encountered during traffic or investigative stops. This information was obtained by reviewing the Officer's Daily Report and the Body Worn Camera events.

The Body Worn Camera events revealed the reasons for the traffic stops entailed: speeding, defective headlights, expired plates, obscured license plate, failed to yield, glaring headlights, disregard red signal, canceled plate in Secretary of State (S.O.S.). During the investigations the ordinances issued resulting in the following that are included but not limited to: failed two signal, unregistered motor vehicle, driving while license suspended, glaring headlights, and expired plates, disregard red signal, defective license plate, no valid plate, obscured license plate, uninsured motor vehicle, and no proof of insurance.

It should be noted, Officer Garrison referred to an African American female as "Keisha" several times in the video review events. Also, Officer Garrison made several comments regarding the walk of shame, mentioned in the above synopsis. Then, Officer Garrison made a comment and referred to an Arabic male as a "Terrorist" mentioned in the above synopsis.

Commanding Officers should initiate an Investigation and Report regarding Police Officer Garrison and Officer Garrison's body worn camera events. This should be done within the next ninety days before the expiration of the body worn camera footage.

The video events for Officer Garrison and Steele revealed their conduct in relation to their care and treatment of citizens during traffic stops should be addressed.

There's a concern that newer officers have been exposed to the conduct exhibited by Officer Garrison and have modeled their conduct from his.

Sixth Precinct supervisors should conduct daily video reviews and forward their findings to Civil Rights Division of all field deployed patrol personnel. In addition, that the Commanding Officers ensure that in-service training is conducted as it relates to care and treatment of all citizens regardless of race, ethnicity, or social status.

All of the Officers assigned to the Sixth Precinct should receive mandatory discrimination, and sensitivity training. The race and gender of the members assigned to the Sixth Precinct should be more diverse.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

*Scope of Review – Control Officer H*

The Civil Rights Body Worn Camera Team performed reviews of the WatchGuard Video System observing the data for the months of December 2018, January, February, and March 2019, in relation to the citizen contacts and towing activities of Control Officer H.

*Methodology*

On December 10, 2018, Control Officer H, working with P.O. Michael Garrison, badge 4185, both assigned to the Sixth Precinct, initiated a traffic stop at 22:10 and investigate a black male for improper plates. The video and category of the event placed in WatchGuard System could not be obtained, due to the 90-Day retention.
**Disposition:** Issued ordinances for driving while license suspended, unregistered motor vehicle, and improper plates. The vehicle was towed.

On December 10, 2018, Control Officer H, working with Officer Garrison, both assigned to the Sixth Precinct, initiated a traffic stop at 23:54 for unknown reasons. The information of the person being investigated was unknown due to lack of notation on the Officers Daily Report. The video and category of the event placed in WatchGuard System could not be obtained, due to the 90-Day retention.
**Disposition:** Unknown due to lack of notation on the Officers Daily Report. The vehicle was towed.

On January 2, 2019, Control Officer H, wearing body worn camera serial number WFC1-033886, working with Officer Garrison, both assigned to the Sixth Precinct, responded to a police run for an accident at 18:48 and investigated a black male, for being stuck in the mud.  Officer Garrison stops the video for unknown reasons. There was no second video for this incident.  The officers categorized the event in the WatchGuard System as Unknown.
**Disposition:** There were no ordinances Issued. The vehicle was towed.

On January 7, 2019, Control Officer H, wearing body worn camera serial number WFC1-041141, working with Officer E, both assigned to the Sixth Precinct, responded to a police run at 17:08 and investigated a 2000 Chevrolet Impala for Abandoned Vehicle. The officers categorized the event in the WatchGuard System as Investigate Person/Vehicle.  Control Officer H stops the video for unknown reasons.
**Disposition:** There were no ordinances Issued. The vehicle was towed.

On January 8, 2019, Control Officer H wearing body worn camera serial number WFC1-041943, working with Officer I, both assigned to the Sixth Precinct, responded to a police run for an auto accident at 22:16 and investigated a black female for an accident.  Control Officer H stops the video for unknown reasons. The officers categorized the event in the WatchGuard System as Traffic Investigation.
**Disposition:** There were no ordinances Issued.  The vehicle was towed.

44

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

On January 18, 2019, Control Officer H, wearing body worn camera serial number WFC1-043930, working with Officer Garrison, both assigned to the Sixth Precinct, initiated a traffic stop at 21:04 and investigated the driver a black female and the passenger a black male, with children in the back seat for glaring headlights. The officers categorized the event in the WatchGuard System as Traffic Investigation.  Control Officer H stops the video for unknown reasons. At 21:10, a second video was started for the same traffic stop.  At 21:47, third video was started for the same traffic stop.

**Disposition:** Issued ordinances for driving while license never acquired, uninsured motor vehicle, and allowing unlicensed driver to drive to the owner of the vehicle. The vehicle was towed.  The driver a black female had warrants and the passenger a black male also had warrants, however, no arrest made.

On January 18, 2019, Control Officer H, wearing body worn camera serial number WFC1-043930, working with Officer Garrison, both assigned to the Sixth Precinct, initiated a traffic stop at 22:30 and investigated a black female for one headlight and expired plates. Control Officer H stops the video for unknown reasons.  At 22:46 a second video was started for the same traffic stop. The officers categorized the event in the WatchGuard System as Traffic Investigation.

**Disposition:** Issued ordinances for driving while license suspended, uninsured motor vehicle, and unregistered motor vehicle. The vehicle was towed. The black female had warrants however, no arrest made.

On January 26, 2019, Control Officer H, wearing body worn camera serial number WFC1-011785, working with Officer M, both assigned to the Sixth Precinct, responded to a police run for an accident at 17:13 and investigated a black female for an accident. The officers categorized the event in the WatchGuard System as Traffic Investigation.

**Disposition:** There were no ordinances Issued. The vehicle was privately towed.

On February 16, 2019, Control Officer H, wearing body worn camera serial number WFC1-022233, was assigned to work with Officer M. However, it was cited on the Officers Daily Report that Control Officer H was an Adam unit, assigned to the Sixth Precinct. At 16:53, responded to a police run and investigated a property damage for an accident with a vehicle. Investigated was the driver a black female with three children, a white female, and white male which were the home owners. The officer categorized the event in the WatchGuard System as Traffic Accident.

**Disposition:** No ordinances were issued. The vehicle was privately towed.

On February 28, 2019, Control Officer H, wearing body worn camera serial number WFC1-037445, working with Officer K, both assigned to the Sixth Precinct, at 17:37, responded to a police run, for an accident and investigated a black male and a black female, both pedestrians struck by a vehicle. At 17:51, the driver a white female was investigated for an accident. At 6:10 a third video was started for the same incident.  The camera turns off for unknown reasons. The officers categorized the event in the WatchGuard system as Traffic Accident.

**Disposition:** There were no ordinances Issued. The vehicle was towed.

45

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

*Detailed Findings*

The following tables display the Investigative Stops, Traffic Stops, and Towing Activities for Control Officer H.

| Investigated Persons by Race/Gender | | | | | | |
|---|---|---|---|---|---|---|
| Time Period | Black Female | Black Male | Arabic Male | White Female | White Male | Totals |
| Dec-18 | 0 | 1 | 0 | 0 | 0 | 1 |
| Jan-19 | 4 | 2 | 0 | 0 | 0 | 6 |
| Feb-19 | 2 | 1 | 0 | 2 | 1 | 6 |
| Mar-19 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 6 | 4 | 0 | 2 | 1 | 13 |

As displayed in the table above, in December of 2018, no black female were investigated, one black male was investigated, no Arabic Male, white female, or white males were investigated.

In January of 2019 4/6 (67%) of investigated persons were black female, 2/6 (33%) were black male, (0%) were Arabic male, (0%) white female, and (0%) white male.

In February of 2019 2/6 (33%) of investigated persons were black female, 1/6 (17%) were black male, (0%) were Arabic Male, 2/6 (33%) white female, and 1/6 (17%) white male.

In March of 2019 (0%) of investigated persons were black female, (0%) were black male, (0%) were Arabic Male, (0%) white female, and (0%) white male.

| Tow Activities | | | |
|---|---|---|---|
| Time Period | Tows from Traffic Stops | Tows from Accidents/ Abandoned Vehicle | Totals |
| Dec-18 | 2 | 0 | 2 |
| Jan-19 | 2 | 4 | 6 |
| Feb-19 | 0 | 2 | 2 |
| Mar-19 | 0 | 0 | 0 |
| Total | 4 | 6 | 10 |

As displayed in the table above, in December of 2018, 2/2 (100%) of Control Officer H's tows were related to traffic stops, zero (0%) were from accidents.

In January of 2019, 2/6 (33%) tows were related to traffic stops, 4/6 (67%) were from accidents.

In February of 2019, zero (0%) tows were related to traffic stops, 2/2 (100%) were from accidents.

In March of 2019, zero (0%) tows were related to traffic stops, zero (0%) were from accidents.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

*Conclusion and Insight*

The review of Control Officer H's Officers Daily Report contained information related to the race or gender of individuals who were encountered during traffic or investigative stops. This information was obtained by reviewing the Officer's Daily Report and the Body Worn Camera events.

The Body Worn Camera events revealed the reasons for the traffic stops included improper plates, glaring headlights, and expired plates. During the investigations the ordinances Issued resulted in the following that are included but not limited to: unregistered motor vehicle, driving while license suspended, improper plate expired plate, uninsured motor vehicle, and driving while license never acquired.

It should be noted, Control Officer H didn't make any comments regarding an African American female as "Keisha" nor any comments regarding the walk of shame, mentioned in the above synopsis.

The video events for Control Officer H revealed the member conducted themselves in a polite and courteous manner in relation to the care and treatment of citizens during traffic stops and encounters. There were no policy violations observed regarding the member Control Officer H.

There's a concern that newer officers have been exposed to the conduct of members assigned to the Sixth Precinct, however Control Officer H did not exhibited any indicators of any racial disparities as it relates to the care and treatment of the citizens, during the aforementioned synopsis above.

Sixth Precinct supervisors should conduct daily video reviews and forward their findings to Civil Rights Division of all field deployed patrol personnel. In addition, that the Commanding Officers ensure that in-service training is conducted as it relates to care and treatment of all citizens regardless of race, ethnicity, or social status.

All of the Officers assigned to the Sixth Precinct should receive mandatory discrimination, and sensitivity training. The race and gender of the members assigned to the Sixth Precinct should be more diverse.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

## HUMAN RESOURCES
**Attendance, Staffing, and Equal Employment Opportunity (EEO)**

*Scope*
Human Resources Bureau/EEO conducted interviews to capture the staffing issues, diversity, equal employment opportunity and the reflections of the employees regarding the effectiveness of the supervision and management of the Sixth Precinct. The condition of the facility was also addressed during the interviews.

*Methodology*
Human Resources conducted interviews of 82 members assigned to the Sixth Precinct having the rank of Commander, Captain, Lieutenant, Sergeant, Detective, Corporal, Police Officer and Office Management Assistant (OMA).  The interviews included members from Platoon 1 through Platoon 4 and were conducted on February 6th, 7th, 8th, 13th, 14th, and 15th.

The participants were advised that their identities would remain anonymous unless there was potential criminality or violations of departmental policies and/or procedures discovered during the interview(s).

The race and gender of the interviewed members was 35/82 (43%) White Male, 25/82 (30%) Black Male, 15/82 (18%) Black Female, 5/82 (6%) Hispanic Male, 2/82 (2%) White Female.

The participants were all asked the same questions.  The questions related to length of employment with the Police Department, time at the Sixth Precinct, staffing issues, diversity and equal employment opportunity and the overall perception of the working environment.  Members were also asked to describe their interactions with one another, with supervision and vice versa.

**Detailed below are the interview questions and summary of responses:**

Q.     **Do you enjoy working at the Sixth Precinct?**

➢  The majority of the employees at the Sixth Precinct really enjoy working there and view each other as family.

Q.     **Do you have a regular partner?  Did you select your partner?**

➢  Most officers indicated they have partners that they selected.  The OMA also advised that she usually pairs officers as they request if possible.

Q.     **Are there any manpower issues?**

➢  Nearly everyone indicated there is a manpower issue and additional officers and supervisors are needed.  They further stated overtime is currently utilized to address the manpower issues within the Sixth Precinct.

48

## ENVIRONMENTAL AUDIT
### (CONFIDENTIAL DOCUMENT)

**Q.     Do you get backup/assistance when requested? How long does it take?**

> Most of the employees interviewed indicated assistance is provided in a timely manner. However, during the audit it was also found that there was an officer who is selective of who he would provide back-up/assistance.

**Q.     Does the assisting unit respond over the radio or do they just show up?**

> Both

**Q.     Does your supervisor ever show-up at your police runs?**

> Most indicated that supervision always show up to their runs. Several stated the current Commander also shows up at runs.

*Diversity and Equal Employment Opportunity (EEO)*

Members were asked questions about their familiarity with the EEO guidelines, and on Diversity. The EEO protected classes were identified for them (i.e. race, sex, age, national origin, gender identity, religion).

**Q.     Are there any diversity/cultural issues?  If so, how has the Commanding Officer addressed them?**

> Several noted that there are no female supervisors assigned to the Sixth Precinct and the third and fourth platoon has no female officers assigned to patrol. They also expressed a desire that more minority officers should be assigned to the precinct.

> A few officers advised that they did not like working with certain officers due to a negative/racist vibe they presented.

> Some advised there were some racial issues in the past and the commanding officer was part of the problem. There was allegedly an incident between two officers, one Black and one White that occurred during a daily roll call.  Allegedly the Chief of Police was present during the roll call. One the officers accused the captain of being racist and the Chief of Police allegedly stood up for the White captain by stating "that can't be, because I just had dinner with him and his wife".

> Several advised that there are racial issues. However, the previous commander did attempt to address them during roll calls.

> There is a lack of female officers and supervisors assigned to the Sixth Precinct.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

➢ The interviews revealed that supervisors were aware of employee(s) 106J and 51G actions and their treatment of Black citizens during their traffic stops. Both employees would return to the precinct to discuss what occurred while they were on patrol.

**Q.**   **Has training been requested?**

➢ Nearly everyone stated training was often approved when requested. However, some stated in the past, training was denied to black officers by employee M.

**Q.**   **Members were asked to name one thing they would like to see changed with respect to the operations of the command, supervision, or employee interaction.**

➢ Seasoned officers advised that more diversity training is needed for the newer police officers, because most of them don't know how to communicate with the black citizens they encounter.

**Q.**   **Members were asked in respect to changes, why is the change important?**

➢ Additional diversity training would help the morale within the Sixth Precinct.

**Q.**   **With respect to employee interaction, and employee/supervisor interaction, what aspects are positive?  What aspects need improvement?**

➢ The positive aspect is most everyone indicated they work well together and problems, if any, are minimal. One of the main issues was favoritism exhibited by some supervisors, cliques amongst African Americans and Caucasians.  They mainly associate with their own race of people.

**Q.**   **Did employee L attend roll call? If yes, how often?**

➢ Several individuals stated employee L did attend roll call on a regular basis.

**Q.**   **Did employee M display any form of bias as it relates to race and or gender?**

➢ Several responded yes to this question.

**Q.**   **Is it true that some supervisors could not supervise employee 106J, and or employee 51G?**

➢ No

**Q.**   **Members were asked their opinion of the indicated Managers and Command Officers of the Sixth Precinct and their ability to effectively lead the Precinct?**

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

Employee K

➢ Everyone had nothing but great things to say about employee K.

Employee 1A

➢ Everyone had nothing but great things to say about employee 1A.  They stated that the employee is an agent of change and they are expecting great things from them.

Employee L

➢ The employee was just an alright employee.

Employee M

➢ Most of the employees don't remember this employee.

Employee N

➢ Most of the employees said this person was a good leader.

*Attendance*

It appears the lower seniority police officers are possibly utilizing sick time due to their inability to secure the requested leave days and/or other types of leave time due to a lack of manpower. Twenty-four of the employees are on initial counseling and/or in the Attendance Control Program.  It should be noted, some of these sick days may represent Family and Medical Leave (FMLA), which is not counted as negative attendance.  The period for this review was January 2017-December 2018.

| RANK | SICK HOURS UTILIZED 2017 | EMERGENCY DAY (E-DAY) HOURS UTILIZED 2017 | SICK HOURS UTILIZED 2018 | EMERGENCY DAY (E-DAY) HOURS UTILIZED 2018 | TOTALS |
|---|---|---|---|---|---|
| Lieutenant | 304 | 40 | 216 | 72 | 632 |
| Sergeant | 546 | 248 | 392 | 184 | 1370 |
| Police Officer | 2768.5 | 1320 | 4309 | 1560 | 9957.5 |
| TOTALS | 3618.5 | 1608 | 4917 | 1816 | 11959.5 |

*Detailed Findings*

• One of the major issues amongst the participants was the physical environment.  There are several safety concerns within the facility.  The front lobby needs a total facelift, the desk in the lobby is too low.  The citizens entering the facility can actually look down on the staff behind the counter. Most stated the position of the counter is not safe, because

51

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

their view is restricted. The glass on the front of facility is not safe. The revolving door that has been inoperable since the shooting incident and they would appreciate it if it were removed. They also are requesting a metal detector in the front.

- The bullet holes from the major shooting incident at the facility is still in the desk and the door. The employees are forced to relive the incident and moral is lowered by viewing the bullet holes.

- There are issues with the ceiling in the newly remodeled kitchen.

There is a gym in the facility, however it is not in any condition to be utilized by the employees. The equipment is broken and they believe the room itself is unsafe and in need of repair, especially the flooring.

- The toilets in the cellblock emits odorous fumes that may be toxic.

- The facility is not cleaned on a regular basis. The trash tends to pile up and the trash cans do not have lids.

- The garage emits an order due to an overwhelming amount of bird feces. The doors to the garage are broken and are often open to birds and unsecured.

- They had a concern with the security of the parking lot. The officers would appreciate a separate parking lot from the citizens. There is no security on the lot. There is a large hole in the fence, there is no security gate, there are no security cameras and they don't feel safe.

- There is a need for new furniture, especially chairs. Nearly all of the chairs are torn up and very old.

- Everyone indicated Sixth Precinct is a great place to work.

The number of eligible members for retirement by rank are: 1 Captain, 2 Lieutenants, 7 Sergeants, 2 Detectives, and 26 Police Officers.

A check of EEO complaints for the time period of January 2018 to the February 19, 2019, revealed there were no complaints from members assigned to the Sixth Precinct.

- There are nine sworn members on restricted duty.

- There are no civilian members on restricted duty.

- There are eleven members with approved FMLA, seven are intermittent and four are continuous.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

- There are no civilian members on FMLA.

- There are no sworn members on extended sick leave.

- There are no civilian members on extended sick leave.

- There is one sworn member on medical leave.

- There are no civilian members on medical leave.

The responses revealed a deep passion for the work within the Sixth Precinct. The majority of the members stated that the Sixth Precinct is one of the best precincts to work at within the department. Respondents did indicate that there are some diversity issues related to race. Apparently, this has been an on-going issue for several years according to several that were interviewed. The employees expressed issues with favoritism and cliques among African Americans and Caucasians.

_Conclusion and Insight_
Nearly everyone interviewed had an issue with the tactics of employee(s) 106J and 51G. They shared the fact that nearly every night toward the end of their shift they would usually stop vehicles that were to be towed. During these stops the citizens often walked to their destination once their vehicle was towed. Once they arrived back to the precinct the trash talking would begin. The citizens whose vehicles were towed, were referred to as being on the "walk of shame." The African American females were referred to as "Keisha's," and the African American males they considered bums were referred to as "Jakes." They also utilized the term "Bye Felicia."

It was also shared with us that supervisor(s) 14E and 19F would be present when the employees returned to the precinct and they in fact witnessed them spewing their rhetoric. They also said employee(s) 106J and 51G would not talk trash around supervisor(s) 13D or 6C.

It is recommended that facility repairs and updates are completed due to several safety concerns. It would also help to uplift the moral of the employees.

All members of the Sixth Precinct should receive annual training in diversity and team building.

The actions of employee(s) 106J and 51G must be addressed.

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

## PROFESSIONAL EDUCATION & TRAINING
### Field and In-service Training

*Scope*

Professional Education and Training (PET) was tasked with conducting on-site inspections of the Sixth Precinct, observing each platoon's on-duty roll call. Training history by platoon and by member were compiled and reviewed. Finally, the precinct armory was examined for any deficiencies.

*Methodology*

A cursory count of available police officers and supervision was tallied by way of Daily Details, which indicated nineteen members were assigned-out in one capacity or another. Each platoon seemed to be staffed comparably, however; Platoon One and Four held the least number of patrol officers at fifteen.

The Audit Team attended roll calls for Platoon's One, Two, and Three. The roll calls appeared to be standard and exposed nothing significant.

*Detailed Findings*

In reviewing roll call training records, it revealed a heavy focus on accident avoidance training for each platoon, especially for February 2018. The only other topic of training captured was Aggravated Assaults. This review also revealed that only five of twelve months had sign-in training rosters with documented subjects of training.

The Sixth Precinct was in compliance and up-to-date with Forty-hour mandatory in-service training, as of the start of the Fiscal year, July 2018. Another focus area of potential concern was members gathering to attend training in established groups. After reviewing the 40-hour training attendance roster and schedule, it was discovered there were no organized groupings of officers based on race or sex, outside of regularly scheduled training dates. Lastly, the armory audit was completed and found to be in full compliance.

*Conclusion and Insight*

There were no issues or areas of concern observed by PET as it relates to conduct resulting from training, or lack thereof. However, it was clear that there were inconsistencies with training course selections, and documentation of all levels of training within the Sixth Precinct. A recommendation would be to improve the training tracking system, and to identify and develop a variety of necessary training for monthly and roll call training sessions.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

## RESOURCE MANAGEMENT
### Inspection of Interior / Exterior of Building

*Scope*
On Monday, February 4, 2019, at approximately 3:30 p.m., Facilities Management was given a directive to conduct an environmental audit of the Sixth Precinct facility, with a specific focus on any demeaning and or derogatory communication(s) written on the walls or lockers in the men's and women's restroom.

On Friday, February 22, 2019, Facilities Management conducted a second environmental audit on the current conditions of the Sixth Precinct.

*Methodology*
On Monday, February 4, 2019, Sergeant Braxton Hall, badge S-733, assigned to Resource Management, responded to the Sixth Precinct and video recorded the unoccupied men's and women's locker rooms, men's and women's public restrooms, the exercise room and the portable trailer, located in the rear of the precinct, which is utilized by the Special Operations Unit. No interviews were conducted.

On Friday, February 22, 2019, Sergeant Steven Myles, S-241, assigned to Facilities Management, responded to the Sixth Precinct and conducted a physical walk-thru throughout the entire facility visually documenting the current conditions of the building.

*Detailed Findings*
Sergeant Hall reviewed the video footage and found no evidence of demeaning or derogatory communication(s) written on the above aforementioned areas of the precinct. No interviews were conducted.

Sergeant Myles observed several major issues such as a crumbling front porch, front revolving door inoperable, worn floor tile front lobby, broken lockers in both men's and women's locker rooms, poor lighting throughout the facility, etc. No interviews were conducted.

*Conclusion and Insight*
There were no findings of demeaning and or derogatory communication(s) written on the premises of the Sixth Precinct.

The findings, as it relates to the poor building conditions, are substantiated. On Monday, March 25, 2019, Cross Construction will begin renovations at the precinct. The above mentioned areas, and more, are covered in the scope of work to be completed.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

## FLEET MANAGEMENT
### Vehicles and Cycle Inspections

*Scope*
On February 7, 2019, Fleet Management performed inspections of the Sixth Precinct's fleet of assigned vehicles in review of the condition, maintenance history.

*Methodology*
There are a total of forty-six vehicles assigned to the Sixth Precinct.  The status of those vehicles are detailed below:

- 14 - Fully Marked Patrol Vehicles, of which one is utilized for Traffic Enforcement.
- 1 - Fully Marked Patrol Vehicles on loan from Fleet Management
- 1 - Watch Commander Vehicle
- 3 - Traffic Vehicles
- 3 - Semi Marked Ceasefire
- 4 - Semi Marked Special Operations
- 1 - Van Designated for Special Operations
- 2 - Undercover Vehicles
- 2 - Traffic Motorcycles
- 6 - NPO Vehicles
- 1 - NPO Van
- 6 - Unmarked PDU Vehicles
- 2 - Executive Vehicles

*Vehicles / Cycles at the Garage for Repair*
- 3 - Marked Patrol Vehicles
- 1 - Traffic Vehicle
- 1 - Traffic Motorcycle

*Detailed Findings*
As it relates to the recurring themes concerning the conduct of Police Officer Gary Steele, badge 4279 and Police Officer Michael Garrison, badge 4185, the review revealed the primary vehicles operated by these officers from July 2018 to January 2019 were vehicle codes 175036, 175055, and 175056 all 3 are Ford Explorers.

The damage history indicates for vehicle code 175036, three instances of damage were noted from May, 2018 to July 2018, vehicle code 175055, four instances of damage were noted from May, 2018 to October, 2018, vehicle code 175056 there were no instances of damage noted.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

Work orders were retrieved for these particular vehicles from the City of Detroit General Services Department. It was revealed that these vehicles were serviced at the Russell-Ferry Garage for general maintenance from May, 2018 to February, 2019. Nothing unusual regarding the maintenance records was revealed.

The damage recorded in the Vehicle Damage History log book was compared to observed damage to the vehicles. The inspection revealed no egregious or inconsistent information.

The review of gas cards did not reveal any improper usage or fuel theft.

*Conclusion and Insight*
The audit did not reveal any egregious information relating to the Sixth Precinct's Fleet.
However, fully marked patrol vehicles should not be utilized to perform traffic enforcement functions on a regular basis when actual Traffic Enforcement vehicles are available.

As a result of this audit, one 2018 semi-marked Ford Taurus and one 2013 semi-marked Dodge Charger was assigned to the Sixth Precinct for traffic enforcement functions. The vehicles were exchanged for one 2013 fully-marked Dodge Charger that was being utilized for Traffic Enforcement functions.

Precincts should discontinue removing fully marked patrol vehicles designated for patrol functions for traffic enforcement functions. Ten of the twelve Precincts were Issued (1) 2018 Ford Taurus (new) each and back filled with one 2013 semi-marked vehicles that were formerly assigned to the Traffic Enforcement Unit.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

## RISK MANAGEMENT
**Performance Evaluations and Responses by Supervisors, Citizen Complaints, Misconduct Reports, Disciplinary Histories, Civil Litigation Actions, Arrests, and Tow Usage**

*Scope*
Risk Management examined citizen complaints, prior misconduct records, disciplinary, and civil litigation histories of Officer Gary Steele and Police Officer Michael Garrison; reviewed performance evaluations by supervisors; reviewed the Management Awareness System (MAS) for supervisory reviews and responses of performance activities categorized in the system as risk events; reviewed arrest and tow usage data; reviewed Daily Observation Reports and Monthly Evaluation Reports for Probationary Police Officers.

Additionally, we examined the arrest and tow usage of Officer Gary Steele in light of the assertions that Officer Steele targeted Black citizens during his investigative stops and towing activities.

*Methodology*
Risk Management examined the citizen complaints of Officer Gary Steele, badge 4279, Police Officer Michael Garrison, badge 4185. We performed comparisons to identify, if any, trends and patterns; developed a comparison group of officers to identify the highest complaint receivers and similarities in their complaint types; reviewed prior misconduct, disciplinary, and civil litigation histories of Officer Steele, Officer Garrison, Probationary Police Officer A and Probationary Police Officer B; reviewed performance evaluations of Sixth precinct officers for the rating period ended October 31, 2018; reviewed the Management Awareness System (MAS) for supervisory reviews and responses of performance activities monitored in the system; reviewed Daily Observation Reports for twenty – one Probationary Police Officers belonging to the Academy Classes of 2016, 2017 and 2018 who were trained by Officer Steele; reviewed Monthly Evaluation Reports for Probationary Police Officers trained at the Sixth Precinct between January 2016 and December 2018.

*Detailed Findings*

> ***Assertion: Supervisors were indifferent to complaints by Officers concerning the racial and gender biased climate at the Precinct.***

*Performance Evaluation Ratings*
On Monday, February 4, 2019, the following findings are based on a review of the Performance Evaluation Reports that were prepared by Sixth Precinct supervisors for the rating period ending October 31, 2018:

- Supervisors did not provide information indicating they were aware of any problems relating to a lack of respect for citizens, colleagues, or the community by Officers.

**ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)**

- Supervisors did not provide any remarks concerning observed or reported early warning signs or problematic characteristics of Officers during encounters with citizens and other members indicative of racial biased practices or attitudes.

- The rating reports did not show any disparities in the supervisors' evaluations of Officers based on race or gender.

- The reports were consistent among white supervisors rating non-white Officers and black supervisors rating non-black Officers.

*Daily Observation Report (DOR) and Monthly Evaluation Report (MER)*

A review of the DOR and MER for Probationary Police Officers (PPOs) did not reveal the evaluating supervisors' discernment of racially insensitive attitudes or biased behavior in the judgement of trainees during the officers' interactions with citizens or colleagues.

The DOR contained minimal comments by the Field Training Officers relating to the performance of trainees in the rated categories listed on the form. When weaknesses were noted in a performance category, the forms lacked information concerning the actions or responses by supervisors to correct deficient areas, improve the trainee's development, or the progress of officers' training.

> *Assertion: Officer Steele passed racially insensitive practices and biased behavior against black females on to newer Officers to the department.*

According to the Daily Details entered in the MAS during the period November 2016 to December 2018, Officer Steele worked with 22 PPOs. We received DORs from Professional Education and Training that were completed by Officer Steele for five PPOs who were assigned to the Sixth Precinct for training.

Two of the five PPOs trained by Officer Steele have received Disciplinary Actions and citizen complaints within the first two years of their service time. The PPOs were Police Officer Jeremy Parinello, Badge 4890 and Police Officer Ibrahim Kakish, Badge 854.

Police Officer Jeremy Parinello, Badge 4890
Officer Parinello was hired on September 26, 2016, he graduated from Professional Education and Training on March 17, 2017. He was assigned to the Sixth Precinct on March 17, 2017.

59

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

| CCR# | Occurred On | Allegation | Disposition: | Race/Gender/Age |
|------|-------------|------------|--------------|-----------------|
| | | Citizen Complaints for Police Officer Jeremy Parinello | | |
| 70400 | 11/7/2018 | Force | Unfounded | Black Male 52 |
| 70311 | 10/9/2018 | Procedure | Unfounded | Black Female 26 |
| 70311 | 10/9/2018 | Demeanor | Unfounded | |
| 69782 | 5/17/2018 | Procedure | Exonerated | Black Female 42 |
| 69543 | 2/18/2018 | Procedure | Exonerated | Black Female 33 |
| 69543 | 2/18/2018 | Demeanor | Sustained | |
| 69425 | 1/11/2018 | Service | Unfounded | Black Female 23 |

Officer Parinello has amassed five citizen complaints within his two years of service concerning encounters with black females in 3/5 (60%) of his complaints.   Of the three incidents involving black females 1/3 (33%) involved a traffic stop and the complainant's vehicle was towed.  The complaint report did not indicate whether the complainant was directed to walk.

In the two remaining complaints involving black females, one alleged that Officer Parinello used profane and derogatory statements, the other stated a failure to properly investigate on the part of Officer Parrinello. This complaint was lodged by a black male.

*Complaint, Areas of Concern, and Findings – Totals for Officer Parinello*

**Areas of Concern**

| Procedure | Demeanor | Force | Service | Total |
|-----------|----------|-------|---------|-------|
| 3 | 2 | 1 | 1 | 7 |

**Complaint Investigation Findings**

| Sustained | Unfounded | Exonerated | Total |
|-----------|-----------|------------|-------|
| 1 | 4 | 2 | 7 |

Disciplinary records did not reflect any actions for Officer Parinello.

Police Officer Ibrahim Kakish, Badge 854
Officer Ibrahim Kakish, Badge 854, was hired on June 29, 2016, he graduated from Professional Education and Training on November 18, 2016. He was assigned to the Sixth Precinct on November 18, 2016.

60

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

| Citizen Complaints for Police Officer Ibrahim Kakish | | | | |
|---|---|---|---|---|
| CCR# | Occurred On | Allegation | Disposition: | Race/Gender/Age |
| **70020** | 7/21/2018 | Demeanor | Sustained | Black Male 36 |
| 70020 | 7/21/2018 | Procedure | Sustained | |
| **69874** | 6/6/2018 | Procedure | Exonerated | Black Female 23 |
| 69874 | 6/6/2018 | Demeanor | Inconclusive | |
| 69874 | 6/6/2018 | Force | Inconclusive | |
| **69311** | 11/19/2017 | Procedure | Unfounded | Black Male 43 |
| 69311 | 11/19/2017 | Demeanor | Sustained | |
| **68992** | 7/25/2017 | Procedure | Exonerated | Black Female 32 |

Officer Kakish has amassed four citizen complaints within his two years of service concerning encounters with black females in 2/4 (50%) of his complaints. The incidents did not involve towing vehicles or directing the women to walk. The complaint data involving Officer Kakish revealed (50%) of the complainants were black females.

*Complaint Areas of Concern and Findings*

## Areas of Concern

| Procedure | Demeanor | Force | Total |
|---|---|---|---|
| 4 | 3 | 1 | 8 |

## Complaint Investigation Findings

| Sustained | Inconclusive/Not Sustained | Unfounded | Exonerated | Total |
|---|---|---|---|---|
| 3 | 2 | 1 | 2 | 8 |

| Police Officer Ibrahim Kakish DISCIPLINARY ACTIONS | | |
|---|---|---|
| DAU File # | Charge(s) | Disciplinary Action |
| 18-0123A | 1) Failure to Exhibit a Polite, Dignified and Courteous Manner Towards Any Person (i.e., on November 19, 2017, Officer Kakish responded to 13516 Blackstone on a disturbance run and used coarse, profane language towards the complainant, Mr. Ronald Wilson, when he stated, " I keep coming out here for the same shit."). | Written Reprimand |

61

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

Disciplinary Records revealed that Police Officer Kakish received a Written Reprimand as a result of a sustained citizen complaint involving Demeanor.

> ***Assertion:*** **Officer Steele did not train Black Probationary Police Officers assigned to the Sixth Precinct.**

A DOR was completed by Officer Steele for Police Officer Nicole Wallace, Badge 4908. A review of Human Resource data indicated Officer Wallace is a Black Female.

Officer Steele rated Officer Wallace with scores of four in all evaluations, which is consistent with the ratings that he provided for white PPOs. A score of 4 indicates that Officer Wallace's performance was meeting the established standards for training.

A review of the Daily Details showed that Officer Steele worked with six black Probationary Police Officers on at least one working day.

***Other Assertions***

> **That Officer Steele targeted black females by towing their vehicles and directing them to walk.**
>
> **That Officer Steele, together with his partner Police Officer Michael Garrison, engaged in biased policing activities directed at black females.**
>
> **That Officer Steele made inappropriate comments by using derogatory and racially charged ethnic names to characterize black males and females.**



Race and Gender of Complainants Accusing
Police Officer Gary Steele

62

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

Police Officer Gary Steele, Badge 4279

Of his 23 total complaints, females were involved in 9 of 23 (39%) incidents.  3 of the 23 (13%) complainants were Black females.

Our review of the complaint data revealed 3 of the 23 (13%) incidents related to towed vehicles involving Officer Steele.

The race and gender of the complainants involved in the tow related complaints were indicated as black males in 2 of 3 (67%) incidents and unknown 1 of 3 (33%). Of the incidents involving towing, the incident details did not indicate the complainants walking.

*Complaint Areas of Concern and Findings*

### Areas of Concern

| Procedure | Demeanor | Force | Arrest | Search | Entry | Service | Total |
|-----------|----------|-------|--------|--------|-------|---------|-------|
| 19 | 11 | 3 | 1 | 1 | 1 | 3 | 39 |

The 23 Citizen Complaints concerning Officer Steele involved a total of 39 areas of concern/allegations.  The largest area of concern related to procedure and demeanor issues.

### Complaint Investigation Findings

| Sustained | Inconclusive/Not Sustained | Unfounded | Exonerated | Pending | Total |
|-----------|----------------------------|-----------|------------|---------|-------|
| 4 | 20 | 2 | 11 | 2 | 39 |

The pattern of behavior exhibited by Officer Steele as indicated by the complaints involve rude or discourteous conduct and language.  His procedure complaints revealed that his enforcement actions were often viewed as unfair and improper, and taken without regard to the concern of the citizen. The complaint details did not provide information concerning the complainants had been referred to as "Keisha", "Felicia", or "Jake."



Race and Gender of Complainants Accusing
Police Officer Michael Garrison

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

Police Officer Michael Garrison, Badge 4185

Of his 18 total complaints, females were involved in 11 of 18 (61%) incidents. 6 of the 18 (33%) complainants were black females. 1 of the 18 (5%) incidents related to a towed vehicle by Officer Garrison.

The race and gender of the complainant involved in the one tow related complaint was indicated as black female. For this incident, the complaint details did not provide information concerning the complainant walking.

*Complaint Areas of Concern and Findings*

### Areas of Concern

| Procedure | Demeanor | Force | Arrest | Property | Entry | Service | Total |
|-----------|----------|-------|--------|----------|-------|---------|-------|
| 14 | 2 | 5 | 2 | 2 | 2 | 4 | 31 |

The 18 Citizen Complaints concerning Officer Garrison involved a total of 31 areas of concern/allegations. The largest area of concern related to procedure issues.

### Complaint Investigation Findings

| Sustained | Inconclusive/Not Sustained | Unfounded | Exonerated | Total |
|-----------|----------------------------|-----------|------------|-------|
| 5 | 12 | 7 | 8 | 32 |

The pattern of behavior exhibited by Officer Garrison as indicated by the complaints, involve citizens viewing his enforcement actions as unfair, improper, and unjustified.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

*Arrests by Officer Gary Steele*

The following information was developed from a review of data extracted from the Records Management System (RMS).

A review of the arrests by Officer Steele during 2017 and 2018 revealed the race and gender demographics included 11/16 (69%) black males, 4/16 (25%) black females, and 1/16 (6%) white male.



*Additional Information*

Data extracted from the Computer Aided Dispatch System revealed that Officer Steele utilized the following towing Companies.



65

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

The data revealed the towers were spread out over towing companies. Goch and Sons, Genes' Towing, and B4 Towing were utilized at a ratio of 1:192 (1%) tow uses. J&C Towing was utilized most frequently at 34:192 (18%).

*PEER Group of Officers*

The PEER Group consisted of officers whose assignment was patrol and they were hired in the year 2000.

The data revealed that Officer Steele placed seventh in the PEER Group having amassed 23 total complaints since date of hire. Officer Garrison placed eleventh having received a total of 18 total complaints. Officer Derrick Knox, Badge 3715 assigned to the Fifth Precinct placed first with a total of 66 complaints.

The areas of concern involving these Officers were Procedure, Demeanor.



*Actions Taken by Sixth Precinct Supervision (PEERs and Administrative Counseling Registers)*

Police Officer Gary Steele

A review of the PEERs data in MAS revealed that on September 18, 2011 Lieutenant Christopher Cole, Badge L-1 and Lieutenant Tharadrous White, Badge L-6 held a PEERS meeting with Officer Steele as a result of the performance indicators triggered in MAS involving uses of force and a citizen complaint. The supervisor determined that "no monitoring" of Officer Steele's on-going performance was necessary.

The supervisors indicated that they relied on the statements of Officer Steele regarding the truthfulness of the complainant involved in the citizen complaint and further stated the use of force was proper.

Officer Steele has not received a Negative Administrative Counseling Register.

Police Officer Michael Garrison

Officer Garrison has not received any PEERs

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

*Allegations of Misconduct / Disciplinary Actions / Civil Litigation*
**Police Officer Gary Steele**
The data related to Officer Steele's misconduct activities showed three incidents of firearm violations, one incident of criminal domestic battery, one excessive use of force. His lawsuits related to three Assault and Battery, False Arrest or Imprisonment actions, and one Fourth Amendment Rights Violation.

| Police Officer Gary Steele's ALLEGATIONS OF MISCONDUCT | | |
|---|---|---|
| Case Number | Incident Date | Allegation/ Charge |
| IA-03 209 | 9/21/2003 | Assault and battery |
| FI-06 047 | 5/22/2006 | Shots fired intentional |
| FI-08 008 | 3/4/2008 | Shots fired intentional |

| Police Officer Gary Steele's DISCIPLINARY ACTIONS | | |
|---|---|---|
| DAU-File # | Charge(s) | Disciplinary Action |
| 02-0523B | 1) Leaving Post Without Proper Relief or Purpose, 2) Neglect of Duty (i.e., fail to record his contact with a citizen) and 3) Neglecting to Report Any Member of the Department Known to be Guilty of Any Rule, Regulation or Order Issued for the Guidance of the Department. | 3 Days Suspension without Pay |
| 09-0486 | 1) Conduct Unbecoming an Officer (i.e., on March 4, 2008, fire warning shots during a verbal and physical altercation), 2) Conviction in Any Court of Criminal Jurisdiction (Except for Minor Traffic Violations) (i.e., plea "No Contest" to a misdemeanor charge of "Reckless Discharge of a Weapon in a Building") and 3) Careless or Unjustified Use of a Firearm or Weapon (i.e., fired shots in a carelessly and reckless manner). | 90 Days Suspension without Pay |
| 12-0549 | 1) Striking a Person Who Is Restrained (i.e., on October 8, 2011, struck a handcuffed prisoner in the face/mouth while he was seated in the back seat of the scout car), 2) Unnecessary Use of Force (i.e., struck a prisoner without cause or justification) and 3) Mistreatment of Any Person (i.e., striking a prisoner in the face/mouth with the palm of his hand). | 3 Days Suspension without Pay |

ENVIRONMENTAL AUDIT
(CONFIDENTIAL DOCUMENT)

| Police Officer Gary Steele's DISCIPLINARY ACTIONS | | |
|---|---|---|
| DAU-File # | Charge(s) | Disciplinary Action |
| 04-0478C | 1) Neglect of Duty, i.e., failed to document the in-car video tape number on his Activity Log. | Not Guilty |
| 08-0787B | 1) Neglect of Duty i.e., failed to make a Domestic Violence report and fail to make proper notification. | Dismissed |
| FI 18-014 | Allegation of Excessive Force | Pending |

| Police Officer Gary Steele's CIVIL LITIGATION | | | |
|---|---|---|---|
| AMOUNT | CAUSE DESCRIPTION | Plaintiff Race | Plaintiff's Gender |
| $700,000.00 | Assault, battery, false arrest, imprisonment | Unspecified | Female |
| $70,000.00 | Assault, battery, false arrest, imprisonment | Unspecified | Male |
| $48,500.00 | Fourth Amendment Violation | Unspecified | Male |
| No Payout/Case was Dismissed | Assault, battery, false arrest, imprisonment | Unspecified | Male |

Police Officer Michael Garrison

The data related to Officer Garrison's misconduct activities showed two incidents of firearm violations, one injured prisoner, one excessive use of force, two police misconduct occurrences. His law suits related to one Personal Injury, and one Constitutional Rights Violation.

| Police Officer Michael Garrison's ALLEGATIONS OF MISCONDUCT | | |
|---|---|---|
| Case Number | Incident Date | Allegation/ Charge |
| FI-03 048 | 4/10/2003 | Injured Prisoner |
| FI-07 078 | 12/31/2007 | Shots Fired Intentional |
| FI-11 013 | 3/23/2011 | Use of force |
| FI-09 071 | 12/10/2009 | Police misconduct |
| FI-13 019 | 12/8/2009 | Police misconduct |

68

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

| **Police Officer Michael Garrison's** | | |
|---|---|---|
| **DISCIPLINARY ACTIONS** | | |
| **DAU File#** | **Charge(s)** | **Disciplinary Action** |
| FI08-0174D | On June 11, 1008, this file was reviewed by Attorney Letitia C. Jones, of the City of Detroit Law Department with the recommendation of Administrative Closure. | Case Closed |
| FI08-0855A | 1) Unjustified or Careless Use of a Firearm or Weapon (i.e., discharged his department Issued weapon without justification). | 5 Days Suspension |
| FI11-0675 | 1) Operate A Department Vehicle In Such A Manner As to Become Involved In A Traffic Crash Classified As Preventable (i.e., on July 4, 2011, became involved in a traffic crash classified as preventable). | Written Reprimand |
| FI13-0189A | 1) Conduct Unbecoming An Officer (i.e., on December 10, 2009, shot a deer while in a public park with a 20 gauge shotgun and a bow gun; did, recklessly, heedlessly and willfully discharge a shotgun at a deer in a public park violating Michigan Compiled Law MCL742.863a and hunted a deer causing himself to be criminally investigated by the Michigan State Police Department of Natural Resources),<br>2) Unjustified or Careless Use Of Firearm or Weapon (i.e., carelessly and unjustifiably discharge a shotgun in a public park) and<br>3) Willfully Making A False Oral, Written Statement or Report (i.e., willfully make false oral statements during a Garrity interview). | 60 Days Suspension |
| FI08-002 | False Oral/Written Statement<br>Non-Approved Department Ammo | Pending |

| **Police Officer Michael Garrison's** | | | |
|---|---|---|---|
| **CIVIL LITIGATION** | | | |
| **AMOUNT** | **CAUSE DESCRIPTION** | **Plaintiff Race** | **Plaintiff's Gender** |
| $270,000.00 | Personal Injury to another | Unspecified | Male |
| $21,500.00 | Violation of Constitutional Rights | Unspecified | Male |

*Conclusion and Insight*

Supervisory Evaluations and Responses

The ratings and evaluations by supervisors did not reveal an awareness that trends of racial insensitiveness were developing among Officers at the Sixth Precinct.

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

The documented evaluations of trainees were ineffective in that they failed to provide details regarding the recruit's progress during training, observed performance weaknesses, or the need for correction to address deficiencies observed in the rated categories.

Citizen Complaint Data

The review of the citizen complaint incidents involving Officer Steele revealed a trend of behavior relating to courtesy, discretion, and general conduct which is perceived by citizens as unprofessional, coarse, and insensitive.

The race and gender of the complainants involved Males (61%), Females (39%) and the racial categories were (30%) Black, (8%) Arabic, (4%) Hispanic, (4%) White, (52%) Unknown, (4%) Other. The high rate of unknowns is likely caused when the racial category was not obtained at the time the complaint was received.

The review of the citizen complaint incidents involving Officer Garrison revealed a trend of procedural issues relating to duty responsibilities concerning filing reports, arrests, and investigative actions that were perceived by citizens as unfair and unjustified.

The race and gender of the complainants involved Females (61%), Males (39%) and the racial categories were (44%) Black, (12%) Arabic, (6%) White, (5%) Hispanic, (5%) Other, (28%) Unknown. The high rate of unknowns is likely caused when the racial category was not obtained at the time the complaint was received.

*Misconduct and Civil Litigation Activity*
Police Officer Gary Steele

The data related to Officer Steele's allegations of misconduct, disciplinary actions, and civil litigation revealed conduct which indicates a trend of disregarding department policies concerning relating to criminal misconduct, unprofessional conduct, use of force, and firearms violations. The nature of the civil lawsuits involving Officer Steele relate to Constitutional Rights violations concerning search, false imprisonment and battery. The overall finding concerning Officer Steele's performance record displayed conduct that is contrary to the standards reasonably expected of sworn Officers.

Police Officer Michael Garrison

The data related to Officer Garrison's allegations of misconduct, disciplinary actions, and civil litigation revealed conduct which indicates a trend of disregarding department policies relating to unprofessional conduct, use of force, firearms, and job standards violations. The nature of the civil lawsuits involving Officer Garrison relate to constitutional violations concerning Constitutional Rights violations and personal injury of another. The overall finding concerning Officer Garrison's performance record displays conduct that is contrary to the standards reasonably expected of sworn Officers.

The complaint activity of two Probationary Police Officers revealed an emerging pattern in their accumulated number and types of allegations against them. The overall analysis of their misconduct activities revealed an emergence of discourteous and rude behavior by the trainees.

Sixth Precinct supervisors should conduct daily video reviews of all field deployed personnel and forward their findings to the Civil Rights Division. Any observed instances of discourteous,

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

insensitive, disrespectful treatment of individuals by officers should be addressed immediately. Supervisors should document their corrections of members who are observed using offensive language, expressions, or other conduct toward citizens based on the race or gender of that person, and refer the member to attend training. The supervisor should remain alert of conduct that does not improve after correction or training and initiate a PEERS action report in MAS.

As revealed during this review of the performance data concerning Officer Gary Steele and his partner Police Officer Michael Garrison, their negative performance scars DPD's relationship with the community, and the impact of passing bad behavior on to new Officers, as well as the financial losses experienced by the City is significant.

*Recommendations*
Training for Sixth Precinct Personnel
All current and formerly assigned Sixth Precinct Personnel should be provided with training which covers racial and cultural awareness, prejudicial behavior, implicit bias, to increase their knowledge of the attitudes and expressions which negatively impacts an individual because of their race, gender, or belonging to a specific group. Transferred members should be identified to attend this training, to address concerns that racially insensitive ideologies and behaviors are transplanted by members being assigned to a new command. Training should be on-going, and in addition to being offered during the annual 40 hour training sessions.

As a result of the concerns relating to discourteous and unprofessional conduct by members of the Sixth Precinct, all assigned members should immediately receive and acknowledge acceptance of the Code of Conduct Policy.

The new officers trained by Officer Steele should receive additional training in customer service, implicit bias, and constitutional policing due to their exposure to Officer Steele and his influence on their field training experience.

First Line Supervisors
Supervision should promote effective communication with members about issues concerning race. An open and honest discussion should allow members to freely express their perceptions and feelings regarding issues of race and general differences of individuals. Supervisors should identify methods to develop members' outlooks about the community to ensure that they do not become desensitized to racial insensitive behavior and racial micro aggressions are prevented when interacting with citizens. The goal is to have a proactive conversation to prevent negative behaviors from occurring or escalating.

Further, supervisors should conduct daily reviews of body worn camera video for all field deployed personnel and forward their findings to the Civil Rights Division. Any observed instances of discourteous, insensitive, disrespectful treatment of individuals by officers should be addressed immediately.

Subsequently, supervisors should document their corrections of members who are observed using any offensive language, expressions, or other conduct that targets individuals based on their race, gender, or participation in a particular group. Corrective measures should be

**ENVIRONMENTAL AUDIT**
**(CONFIDENTIAL DOCUMENT)**

progressive with the goal to prevent any recurrence of the negative behavior. Supervisors should remain alert of conduct that does not improve after correction or training.

Supervisors should be reminded of the department's process to proactively identify and address problematic behavior. The Department's Management Awareness System policy should be reemphasized to supervisory personnel to include reviewing the requirements of the Performance Evaluation and Enhancement Review Session. Following this further, a PEERS report can be generated by a supervisor, at any time, to review work performance issues. This can be done in addition to the PEERS that are generated by the MAS administrator for the specific work performance activities that are monitored by the system.

Supervisors should communicate the Department's mission statement and vision, emphasizing the performance expectations and potential actions which could result from conduct that is contrary to the policies, procedures, and practices of the department.

Overall, the audit identified indifference on the part of Supervision to address the concerns by members about the discourse between officers that had racial implications. Supervisors must be attentive to these issues and respond appropriately. Supervisors should act to dispel rumors of racial tensions within the working environment. Supervisors should remain observant for cliques forming within the precinct, where members are being ostracized based on race or gender

The audit revealed a lack of diversity on Platoon Three in respect to race and gender. To improve relationships amongst members, supervisors should rotate officers   when making scout car and shift assignments to increase their exposer to working with officers of different backgrounds and gender. By doing so, the overall working experience is enhanced, especially for new officers to the department.

Command Officers and Senior Management
Command Officers and Senior Management should reemphasize the mission and vision of the department as it relates to respecting the various differences in the community that is served by members of the Sixth Precinct. This can be done at roll calls or in-service training held at the Precinct. Command Officers and Senior Management must provide members with the Chief's commitment of respect for the community, and the performance expectations of all DPD members.

Command officers should meet with first line supervisors to discuss the morale and environment of the Sixth Precinct as a result of the events involving Police Officer Gary Steele and Police Officer Michael Garrison.